ASA–BRANDT, INC. a/k/a ASA–Brandt Partnership; Phillip ASA; Keith Brandt; Robert Becker; Dennis Cink; Duanne Dewaard; Beverly Everett; Richard Gardner; Edward A. Otis; Jim Otis; Ronald Schmidt; and Debra Schmidt, Plaintiffs,

v.

ADM INVESTOR SERVICES, INC.; Fac–Marc, Inc.; Agri–Plan, Inc.; Competitive Strategies for Agriculture, Ltd., and Farmers Co–Operative Society, Defendants.

No. C01–3021–MWB.

United States District Court,
N.D. Iowa,
Central Division.

April 18, 2001.

Nicholas P. Iavarone, Bellows & Bellows, P.C., Chicago, IL, Scott G. Buchanan, Bibler, Buchanan & Gabor, Algona, IA, Dawn Mastalir, Moore, Berenstein, Heffernan & Moeller, Sioux City, IA, for plaintiff.

Richard J. Rappaport, Amy B. Manning of Ross & Hardies, Chicago, IL, Margaret M. Prahl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, IA, for defendant ADM Investor Servs., Inc.

Miranda L. Hughes of Brown, Winick, Graves, Gross, Baskerville and Schoenbaum, P.L.C., Des Moines, IA, for defendant Farmers Co–Operative Society of Wesley ("Wesley").

## MEMORANDUM OPINION AND ORDER REGARDING PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND CROSS–MOTIONS FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* .................................................... 1147
 A. *Procedural Background* .............................................. 1147
 B. *Factual Background* ................................................ 1151

II. *LEGAL ANALYSIS* ................................................ 1155
 A. *Standards For Summary Judgment* .................................... 1155
 B. *ADM's Motion For Summary Judgment* ................................ 1156
 1. *CEA claims* ................................................. 1156
 a. *Contemplation of actual delivery of grain* ....................... 1158
 b. *Multi–factor analysis of contemplated delivery* .................. 1162
 2. *Proof Of Agency Relationships* ..................................... 1165
 a. *Agency under Iowa law* ....................................... 1165

 *b.* *Effect of Introducing Broker status* .............................1167

 *c.* *Supervision*................................................1169

 *C.* *FAC–MARC And Agri–Plan's Joinder In ADM's Motion*..............1169

 *D.* *The Producers' Motion For Partial Summary Judgment* .................1170

 *E.* *Wesley's Motion For Partial Summary Judgment* ......................1170

 *1.* *CEA claims* .........................................................1170

 *2.* *Breach of fiduciary duty*............................................1170

 *a.* *Fiduciary relationships under Iowa law*.........................1170

 *b.* *Inferences of a fiduciary relationship* ...........................1171

*III.* *CONCLUSION* ..............................................................1173

There is a Chinese saying that there are always three sides to the story: yours, mine, and the facts. Here, in support of or in resistance to cross-motions for summary judgment, the parties have provided the court with their respective two sides to the story. The court must determine the third side of the story from the parties' submissions and then whether summary judgment may be entered on any of the numerous claims in dispute in this litigation.

## I. INTRODUCTION

### A. Procedural Background

This case arises from hedge-to-arrive contracts ("HTAs"), contracts for the sale and purchase of grain, that were entered into by grain producers and grain elevators.[1] On June 14, 1996, case No. C96–3148–MWB ("*Gunderson*"), was filed in the United States District Court for the Northern District of Illinois. Plaintiffs in *Gunderson* are a group of grain producers seeking declaratory judgment and other relief as described in greater detail below. Plaintiffs alleged, *inter alia*, that defen-

---

1. The Seventh Circuit Court of Appeals provided a cogent explanation of HTAs in *Harter v. Iowa Grain Co.*, 220 F.3d 544 (7th Cir. 2000):

> Farmers often contract to sell grain to grain elevators at some specific time in the future. Such contracts guarantee farmers a buyer for their grain and guarantee grain elevators a supply of a commodity. The contracts generally specify the quantity and quality of grain to be sold, as well as a delivery date and a price for the grain. Both parties, by agreeing in advance to the grain price, take a risk that the market will move against them. The farmer's risk is that grain prices will be higher at the time of delivery, thus causing him to forego profit by selling at too low a price; the elevator's risk is that prices will drop, causing it to purchase unduly expensive grain. "Hedge-to-arrive" contracts (HTA contracts) attempt to alleviate these risks by introducing price flexibility. *See The Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 319 (6th Cir.1998). HTA contracts use two price indices—a "futures ref-

> erence price," set by the Chicago Board of Trade for some time in the future, and a "local cash basis level," which is a local adjustment to the national price. *See id.* In an HTA contract, the parties generally agree at the time of contracting on the national portion of the price, and defer agreement on the local part of the price. *See id.* Many HTA contracts are "flexible," meaning the parties may "roll" the established delivery date to some point in the future. *See id.* When an elevator enters an HTA contract, it usually "hedges," or tries to offset the risk of paying unduly high prices, by buying an equal and opposite position in the futures market. *See id.* If either party to an HTA contract rolls the delivery date forward, the elevator buys back its original hedge and rehedges by purchasing a new futures contract. *See id.* The spread between the original hedge position and the "rolled" hedge position is attached to the price per bushel of the original HTA contract, and the farmer runs the risk of assuming a debit. *See id.*

*Harter*, 220 F.3d at 547.

dants engaged in the promotion and marketing of HTAs in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*[2] Also on June 14, 1996, case No. C96–3151–MWB (*Hoover*), which likewise seeks declaratory judgment and other relief, was filed in the United States District Court for the Northern District of Illinois by a second group of grain producers. All of the grain producers will be referred to herein collectively as the Producers. Both the original complaints in *Gunderson* and *Hoover* asserted the same thirteen claims for relief.[3]

On September 25, 1996, the Honorable Suzanne B. Conlon, United States District Court Judge for the Northern District of Illinois transferred *Gunderson* to the Northern District of Iowa. On October 3, 1996, the Honorable James H. Alesia, United States District Court Judge for the Northern District of Illinois, transferred *Hoover* to the Northern District of Iowa.

Defendants ADM and the Grain Elevators subsequently moved for dismissal of the Producers' claims on a number of grounds. On April 17, 1997, the court entered its ruling on defendants' motions to dismiss and found, *inter alia,* that the Producers' CEA fraud claims had not been pleaded with sufficient particularity. The Producers were directed to file an amended complaint adequately pleading fraud

---

**2.** Named as defendants in the original *Gunderson* complaint were: ADM Investor Services, Inc., ("ADM") a futures commissions merchant registered with the Commodity Futures Traders Commissions ("CFTC"); FAC–MARC, Inc. ("FAC–MARC"), a commodity trading advisor registered with the CFTC; Agri–Plan, Inc., ("Agri–Plan") and Competitive Strategies for Agriculture, Ltd. ("CSA"), both registered with the CFTC as introducing brokers of ADM; Farmers Cooperative Company ("Ledyard"); Farmers Cooperative Elevator d/b/a Titonka Farmers Cooperative ("Titonka"); Farmers Cooperative Elevator of Buffalo Center, Iowa ("Buffalo Center"); The Farmers Co–Operative Society ("Wesley"); West Bend Elevator Company ("West Bend"); Farmers Cooperative Elevator, Woden, Iowa ("FCE"); Bode Cooperative ("Bode Co–op"); Cylinder Cooperative Elevator Company ("Cylinder Co–op") and Cooperative Grain & Product Company ("Cooperative Grain"). Defendants Farmers Co–op, Titonka, Buffalo Center, FCS, West Bend, FCE, Bode Co–op, Cylinder Co–op and Cooperative Grain are all Iowa grain elevators. Defendants Farmers Co–op, Titonka, Buffalo Center, Wesley, West Bend, FCE, Bode Co–op, and Cylinder Co–op will be referred to collectively as the Grain Elevators.

**3.** Both the original complaints in *Gunderson* and *Hoover* contained the following claims: Count I alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), under 18 U.S.C. § 1962(d), by ADM; Count II alleges a RICO violation, under 18 U.S.C. § 1962(d), by ADM, FAC–MARC, Agri–Plan, and CSA; Count III alleges a RICO violation, under 18 U.S.C. § 1962(a), by ADM, FAC–MARC, Agri–Plan, and CSA; Count IV alleges fraud in violation of § 4b of the CEA, 7 U.S.C. § 6b, against ADM and CSA; Count V alleges that the HTAs are illegal because they violate §§ 4(a) and 4(d) of the CEA, 7 U.S.C. §§ 6(a) and 6(d). Count VI seeks declaratory judgment of the rights of the parties to the HTAs, a declaration that the HTAs are illegal, void, and unenforceable, because they violate §§ 4(a)–(c) of the CEA, 7 U.S.C. §§ 6(a)–(c), § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Act of 1934, 15 U.S.C. § 78c(a)(10); Count VII alleges fraud in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 505/2(5), against ADM; Count VIII alleges a state–law claim for rescission or cancellation of the contracts on the ground of fraudulent misrepresentations; Count IX alleges a state–law claim for breach of fiduciary duty against ADM and CSA; Count X alleges a state–law claim for breach of fiduciary duty against defendant grain elevators; Count XI alleges a state–law claim of fraudulent misrepresentation against ADM, FAC–MARC, Agri–Plan, and CSA. Count XII alleges a state–law claim for breach of contract against the defendant Grain Elevators. Count XIII alleges a state–law claim for negligence against the defendant Grain Elevators.

pursuant to Federal Rule of Civil Procedure 9(b). The court further held that such an amended complaint might also rectify any inadequacies perceived in the pleading of other claims, and therefore the Producers would be permitted to replead each count.

On May 20, 1997, the court consolidated *Gunderson* and *Hoover*. On June 10, 1997, the Producers filed their First Amended Complaint in the consolidated case. The First Amended Complaint contained fifteen claims.[4] Defendants ADM and the Grain Elevators again sought the dismissal of all claims asserted against them in the First Amended Complaint. In its ruling on defendants' motions to dismiss, the court again found, *inter alia,* that the Producers' CEA fraud claims had not been pleaded with sufficient particularity. The Producers were directed to file a second amended complaint adequately pleading fraud pursuant to Federal Rule of Civil Procedure 9(b).

On May 28, 1998, the Producers filed their Second Amended Complaint in the consolidated case.[5] The Second Amended Complaint asserts the following fifteen claims: Counts I and II allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), under 18 U.S.C. § 1962(c), by ADM, CSA, FAC–MARC, and Agri–Plan; Count III alleges a RICO violation, under 18 U.S.C. § 1962(c), by Titonka; Count IV alleges a RICO violation, under 18 U.S.C. § 1962(c), by ADM; Count V alleges fraud in violation of § 4b of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6b, against ADM and CSA; Count VI alleges that the HTAs are illegal because they violate §§ 4(a) and 4(d) of the CEA, 7 U.S.C. §§ 6(a) and 6(c); Count VII seeks declaratory judgment of the rights of the parties to the HTAs, a declaration that the HTAs are illegal, void, and unenforceable, because they violate §§ 4(a)–(c) of the CEA, 7 U.S.C. §§ 6(a)–(c), § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Act of 1934, 15 U.S.C. § 78c(a)(10); Count VIII alleges a violation of the CEA, 7 U.S.C. § 6d, by the defendant grain elevators; Count IX alleges a violation of the CEA, 7 U.S.C. § 6o(1), by Titonka, FCE,

---

4. The First Amended Complaint contained the following fifteen claims: Counts I and II alleges RICO violations under 18 U.S.C. § 1962(c), by ADM, CSA, FAC–MARC, and Agri–Plan; Count III alleges a RICO violation, under 18 U.S.C. § 1962(c), by Titonka; Count IV alleges a RICO violation, under 18 U.S.C. § 1962(c), by ADM; Count V alleges fraud in violation of § 4b of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6b, against ADM and CSA; Count VI alleges that the HTAs are illegal because they violate §§ 4(a) and 4(d) of the CEA, 7 U.S.C. §§ 6(a) and 6(c); Count VII sought declaratory judgment of the rights of the parties to the HTAs, a declaration that the HTAs are illegal, void, and unenforceable, because they violate §§ 4(a)–(c) of the CEA, 7 U.S.C. §§ 6(a)–(c), § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Act of 1934, 15 U.S.C. § 78c(a)(10); Count VIII alleges a violation of the CEA, 7 U.S.C. § 6d, by the defendant grain elevators; Count IX

alleges a violation of the CEA, 7 U.S.C. § 6o(1), by Titonka, FCE, Bode Co-op, Buffalo Center, West Bend, Cylinder Co-op, FCS and Farmer's Co-op; Count X alleges a state-law claim for recission of the HTA contracts against defendant Grain Elevators; Count XI alleges a state-law claim of breach of fiduciary duty against ADM, FAC–MARC, Agri–Plan, and CSA; Count XII alleges a state-law claim for breach of fiduciary duty against the defendant Grain Elevators; Count XIII alleges a state-law claim of fraudulent misrepresentation against ADM, FAC–MARC, Agri–Plan, CSA and Titonka; Count XIV alleges a state-law claim for breach of contract against the defendant Grain Elevators; Count XV alleges a state-law claim for negligence against the defendant Grain Elevators.

5. All defendants named in the First Amended Complaint are again named as defendants in the Second Amended Complaint.

Bode Co-op, Buffalo Center, West Bend, Cylinder Co-op, FCS and Farmer's Co-op; Count X alleges a state-law claim for recision of the HTA contracts against defendant Grain Elevators; Count XI alleges a state-law claim of breach of fiduciary duty against ADM, FAC–MARC, Agri–Plan, and CSA; Count XII alleges a state-law claim for breach of fiduciary duty against the defendant Grain Elevators; Count XIII alleges a state-law claim of fraudulent misrepresentation against ADM, FAC–MARC, Agri–Plan, CSA and Titonka; Count XIV alleges a state-law claim for breach of contract against the defendant Grain Elevators; Count XV alleges a state-law claim for negligence against the defendant Grain Elevators. Defendant ADM again moved to dismiss all claims asserted against it in the Second Amended Complaint. The court granted ADM's motion to dismiss as to that portion of Count VI which is based on claims of excessive speculation because the court concluded that no private cause of action exists under the excessive speculation provisions found in 7 U.S.C. § 6a. The court also granted ADM's motion with respect to the Producers' claims for punitive damages under 7 U.S.C. § 25(3)(b). Finally, ADM's motion was granted with respect to the Producers' claim of negligence found in Count XV because the Producers' negligence claim is only asserted against the Grain elevator defendants. In all other respects, ADM's motion to dismiss was denied.

On January 15, 2001, following a scheduling hearing, the court ordered that these cases be arranged into four separate trials: one trial for all plaintiffs with claims pending against defendant Wesley; one trial for all plaintiffs with claims pending against defendant Titonka; one trial for all plaintiffs with claims pending against defendants Ledyard, West Bend Cooperative Company ("West Bend"), Farmers Cooperative Elevator ("Woden"), Bode Cooperative ("Bode"), and Cylinder Cooperative Elevator ("Cylinder"); and one trial for all plaintiffs with claims pending against defendant Farmers Cooperative Elevator of Buffalo Center ("Buffalo Center"). Subsequently, pursuant to Federal Rule of Civil Procedure 21, the court ordered that these two cases be realigned into four separate cases. The first such case is presently before the court and consists of all plaintiffs with claims pending against defendant Wesley: Asa–Brandt, Inc. a/k/a Asa–Brandt Partnership; Philip Asa; Keith Brandt; Robert Becker; Dennis Cink; Duane DeWaard; Beverly Everett; Richard Gardner; Edward A. Otis; Jim Otis; Ronald Schmidt; and Debra Schmidt. The defendants in the Wesley case consist of Wesley; ADM Investor Services, Inc., ("ADM"); FAC–MARC, Inc. ("FAC–MARC"); Agri–Plan, Inc., ("Agri–Plan"); and Competitive Strategies for Agriculture, Ltd. ("CSA").

On February 15, 2001, ADM filed its motion for summary judgment on all claims of the Wesley Producers. On February 15, 2001, the Wesley Producers moved for partial summary judgment against ADM on the issues of the existence and scope of the alleged agency relationship between ADM and Agri–Plan and on the inadequacy of the supervision of Agri–Plan by ADM. On February 16, 2001, defendant FAC–MARC and Agri–Plan joined in ADM's motion for summary judgment. On February 16, 2001, defendant Wesley moved for a partial summary judgment against the Wesley Producers on the claims contained in Counts VI, VII, IX, and XII of the Second Amended Complaint on the grounds that the HTAs are not illegal, off-exchange futures contracts, and that the Producers cannot establish that Wesley had a fiduciary relationship with the Producers.

The court heard oral arguments on the parties' cross-motions for summary judgment and partial summary judgment on April 6, 2001. At the oral arguments, plaintiffs were represented by counsel Nicholas P. Iavarone of Bellows & Bellows, P.C., Chicago, Illinois, Scott G. Buchanan of Buchanan, Bibler, Buchanan & Gabor, Algona, Iowa, and Dawn Mastalir of Berenstein, Moore, Berenstein, Heffernan & Moeller, Sioux City, Iowa. Defendant ADM was represented by counsel Richard J. Rappaport and Amy B. Manning of Ross & Hardies, Chicago, Illinois, and Margaret M. Prahl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, Iowa. Defendant Wesley was represented by counsel Miranda L. Hughes of Brown, Winick, Graves, Gross, Baskerville and Schoenbaum, P.L.C., Des Moines, Iowa. Counsel were very well prepared and presented spirited and very helpful argument to the court. The parties have filed thorough briefs in support of their respective positions.

**6.** The CEA defines an FCM as:

an individual, association, partnership, corporation, or trust that—(A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market; and (B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(12).

**7.** The CEA generally defines a "CTA" as:

any person who—
(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in—
(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market;

## B. Factual Background

The court will discuss here only the nucleus of undisputed facts pertinent to the present motions for summary judgment.

The Producers are farmers who are grain producers. Defendant ADM is registered with the Commodity Futures Traders Commission ("CFTC") as a Futures Commissions Merchant ("FCM").[6] ADM does not deal in cash grain. Defendant FAC–MARC is registered with the CFTC as a Commodity Trading Advisor ("CTA").[7] Defendant Agri–Plan is registered with the CFTC as an Introducing Broker ("IB").[8] Defendant Wesley is a grain elevator in the business of purchasing grain.

The Producers entered into HTAs with Wesley. ADM is not a party to any of the Producers' HTAs with Wesley. The HTAs contained the following terms:

Time of Shipment

(II) any commodity option authorized under section 6c of this title; or
(III) any leverage transaction authorized under section 23 of this title; or
(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

7 U.S.C. § 1a(5)(A).

**8.** The CEA defines an introducing broker as:

any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant) engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(14).

At least two days prior to the first notice day of the underlying futures month held or if a basis has been written, within the terms of the basis contract.

Terms and Rules: Flex Hedge Contract

* The Buyer (Merchandizer) and the Seller (Producer) will not write Flex Hedge Contracts or Multiple Year contracts for more than can be produced or will be delivered in a normal crop year by the producer.

* The Buyer has the discretion to be informed of the Producers past and current record of production.

* Final Pricing (Setting of the Basis Level and the Basis Delivery Month) will be done at the Sellers discretion, but a least two (2) days before the first notice day and before delivery occurs.

* Final pricing will be done at Merchandizers quoted (Basis Bid) for applicable delivery period. Once a basis is applied to a particular Flex Hedge Contract, all standard delivery contract terms will apply.

* This Flex Hedge Contract must be priced (Basis Set) or rolled to another futures month at a cost of one (1) cent plus or minus the spread to that futures month, prior to the first notice day of the underlying futures month currently held, by the Seller.

* If the underlying futures hedge is not rolled by the first notice day. The merchandizer will elect to roll.

* Multiple year Flex Hedges must be scaled up in subsequent price levels of proportionate and ascending levels.

* The Buyer and seller must be in agreement regarding a multiple year Flex–Hedge plan before it is submitted for implementation in the futures market.

* If a Multi year plan is implemented and the Seller because of higher prices at harvest elects to roll the lower price level Flex Hedges for future use, the Seller will be obligated to deliver the harvested bushels to the buyer of the Flex Hedge Contracts rolled, at the Buyers quoted bid for the applicable period. The Seller may also elect to use an implemented Flex Hedge Contract equal to the current futures price for the applicable period.

* The implementation or Rolling of Flex Hedge futures will be done during open and trading hours at the Chicago Board of Trade.

* If it is determined by the Buyer and Seller that contract bushels are undeliverable, the Producer may elect to buy out of the Flex Hedge Contract at the net equity of the trade plus a cost of five (5) cents per bushel.

* Failure by the Seller to advise the Buyer within 15 days of receipt of this confirmation will be understood by the Buyer as an acceptance of the terms.

Flex–Hedge Contract at p. 1, ADM App. at pp. 31, 33, 35, 37, 39, 41, 43, 45, 47, 49, 51, 53, 55, 57, 59, 61, 63, 65, 67, 69, 71, 73, 75, 77, 79. The HTAs required that the Producers deliver their harvested grain to Wesley, even if they deferred their obligation to deliver at the HTA contract price.

Phil Asa and Keith Brandt had a farming partnership. In 1994, they switched to a farming corporation, Asa–Brandt, Inc. The shareholders of Asa–Brandt, Inc. are Phil Asa and Keith Brandt, and their wives. Keith Brandt was responsible for taking care of all of the paperwork for Asa–Brandt, Inc. The Asa–Brandt partnership used HTAs prior to 1996 and delivered grain in satisfaction of those contracts.

In July of 1993, Philip Asa and Keith Brandt met with Dennis Hofmeister to discuss writing a flex-hedge program for Asa–Brandt, Inc. After the meeting, Hoftmeister put together the flex-hedge plan for Asa–Brandt, Inc. Philip Asa and Keith Brandt filled out their flex-hedge plan with Hofmeister. In 1993, the Asa–Brandt partnership executed two or three HTAs and delivered grain against them. Asa–Brandt, Inc. paid Hoftmeister for advice in marketing grain and for writing its flex-hedge when there was a fill under the terms of the HTA. Hofmeister advised Asa–Brandt, Inc. on rolls and trading under its flex-hedge program.

On April 3, 1995, Robert Becker met with Hofmeister and together they drafted a flex-hedge plan for Becker. In the fall of 1995, Robert Becker and other farmers met with Hofmeister and went over the flex-hedge plans. Hofmeister advised Becker regarding the strike prices he should place in his flex-hedge plan. Becker paid Agri–Plan, Inc. and FAC–MARC, Inc. for Hofmeister's advice regarding marketing grain. Hofmeister advised Becker when to roll his HTAs. In September of 1995, Becker attended a meeting at the Farm Bureau building in Algona, Iowa, at which Hofmeister told the farmers in attendance when to roll their HTAs. Becker relayed Hofmeister's recommendation that Becker roll his HTAs to Wesley's manager, Art Beenken, who agreed that it was a good idea.

On June 28, 1995, Dennis Cink met with Hofmeister in Clear Lake, Iowa. At the meeting, Hofmeister described the flex-hedge program and encouraged Cink to implement it. Hofmeister gave Cink worksheets and instructions for writing the HTAs. After their meeting, Cink filled out a flex-hedge plan from Hofmeister's instructions. Cink took the flex-hedge plan to Wesley in order to talk to Beenken

about it, but Beenken was gone. Cink instead spoke to Jerry Arndorfer, who informed Cink that Wesley was writing HTAs.

Beverly Everett met with Dennis Hofmeister in Clear Lake, Iowa. At the meeting, Hofmeister explained the flex-hedge program to her and Everett filled out a flex-hedge worksheet. Everett also signed a fee agreement with Hofmeister under which she agreed to pay Hofmeister for his marketing advice. Hofmeister advised her on her HTAs. Everett only knew that she had to pay the elevator a fee to roll her HTAs and pay Hofmeister his commission under the contracts. Everett decided to market two more years of grain under the flex-hedge program on the advice of Hofmeister. Everett attended the meeting at the Farm Bureau building in Algona, Iowa, in September of 1995, at which Hofmeister advised all of the flex-hedge participants to roll their contracts to May of 1996.

In September 1994, Duane DeWaard met with Hofmeister in Clear Lake to discuss marketing strategies for grain. Following this meeting, DeWaard drafted flex-hedge plans based on Hofmeister's instructions. Beenken had referred DeWaard to Hofmeister. DeWaard went over the HTA with Hofmeister and then gave the flex-hedge plan to Beenken at Wesley to implement. DeWaard paid Hofmeister for his marketing advice. DeWaard attended the meeting at the Farm Bureau building in Algona, Iowa, in September of 1995, and changed his flex-hedge plans in accord with Hofmeister's advice. DeWaard rolled his contracts in accord with advice from Hofmeister.

Richard Gardner went to see Hofmeister in Clear lake at the same time as Everett. Hofmeister informed them about the flex-hedge marketing plan and showed them several sample plans while he explained

the flex-hedge marketing concept to them. Hofmeister discussed rolling and spreads with Everett and Gardner. Gardner trusted Hofmeister's advice concerning rolls. Gardner filled out a flex-hedge worksheet at the initial meeting with Hofmeister using Hofmeister's advice as guidance. Hofmeister advised Gardner as to when to roll his contracts. Gardner attended the meeting at the Farm Bureau building in Algona, Iowa, in September of 1995. At the meeting, Hofmeister advised Gardner to roll his contracts to May of 1996.

Ron Schmidt met with Hofmeister in Clear Lake and learned about the flex-hedge program. At the meeting, Schmidt received advice from Hofmeister regarding marketing plans for his grain. Schmidt also received a marketing plan prepared by Hofmeister. At his initial meeting with Hofmeister, Schmidt signed a contract with Agri–Plan and Hofmeister filled out Schmidt's marketing plan. Schmidt took his marketing plan, prepared by Hofmeister to Beenken at Wesley in order to implement the plan. Hofmeister advised Schmidt on when to roll his contracts.

On February 15, 1995, Jim Otis and Ed Otis met with Hofmeister to discuss writing a flex-hedge program. At the meeting Jim Otis and Ed Otis filled out their marketing plans pursuant to the advice of Hofmeister. Jim Otis and Ed Otis paid Hofmeister, via payments to Agri–Plan and FAC–MARC, to act as their advisor in regard to the flex-hedge program. Jim Otis and Ed Otis, *inter alia,* relied on advice from Hofmeister in rolling their HTAs. Both Jim Otis and Ed Otis attended the meeting at the Farm Bureau building in Algona, Iowa, in September of 1995, at which Hofmeister advised the farmers there when to roll their HTAs and assisted the farmers in creating new marketing plans.

Beenken followed the flex-hedge plans put together by the Producers. Beenken did not draft the flex-hedge plans or assist the farmers in drafting them. Beenken conferred with Hofmeister regarding the flex-hedge program prior to it being implemented at Wesley. Other than assessments paid to Wesley for rolling HTAs, the Producers never paid Beenken for advice regarding the flex-hedge program. Beenken did not implement flex-hedge programs for any producers who did not use Hofmeister as advisor. Hofmeister advised the Producers on when to roll their HTAs.

None of the Producers ever spoke with an employee of ADM regarding HTAs. The clearing agreement between Agri–Plan and ADM unequivocally states that Agri–Plan is not an agent of ADM:

15. IB is an independent contractor and not an agent of ADM. Without prior written approval of ADM, IB will not use the ADM name on its door or on its office facility, on its stationary, in its telephone listing or in any other commercial listing. IB shall not use the name ADM in answering its telephone or in any other way hold itself out to be associated with ADM other than in the relationship of independent contractor, i.e. IB to a futures commission merchant which carries IB's trades on a disclosed basis and holds the funds of its customers. In contracting for support services such as rent, telephone, quotations, utilities and the like IB shall contract in its own name and not use or refer to the name ADM.

Clearing Agreement at pp. 5–6, ADM App. at 847–48. The CTA agreement between ADM and FAC–MARC similarly contains a provision outlining the scope of their relationship:

1. SCOPE OF RELATIONSHIP. Advisor is not an employee, joint venturer,

or partner of ADM, and Advisor shall have no authority, express or implied, to act as an agent of ADM. Advisor shall have no authority to represent, contract for or bind ADM, or to assume or create any obligation on behalf of ADM. Advisor agrees that it shall not hold itself out or represent to any person to the contrary.

CTA Agreement at p. 1, ADM App. at p. 827.[9]

The Producers had a history of delivering their grain to Wesley. Wesley anticipated delivery of grain under the HTAs at some point. Two of the Producers, ASA and Brandt, delivered grain to Wesley under the HTAs.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R.CIV.P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa

1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(a)–(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing

---

9. The "Advisor" referred to in the CTA agreement is FAC–MARC. CTA Agreement at p. 1, ADM App. at p. 827.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod.Liab.Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the parties' motions for summary judgment and partial summary judgment.

### B. ADM's Motion For Summary Judgment

#### 1. CEA claims

The court initially takes up ADM's argument that summary judgment should be granted in its favor on the Producers' CEA claims. The CEA requires that transactions in commodity futures contracts take place only under the rules of a board of trade that has been designated by the Commodity Futures Trading Commission ("CFTC"). Contracts for "any sale of any cash commodity for deferred shipment or delivery," otherwise known as cash-forward contracts, are excluded from regulation under the CEA. *See* 7 U.S.C. § 1a(11); *Grain Land Coop. v. Kar Kim Farms, Inc.*, 199 F.3d 983, 990 (8th Cir.1999). In this case, ADM contends that the HTAs involved in this litigation are valid "cash forward contracts" exempt from regulation under the CEA while the Producers contend that the HTAs here are illegal, "off-exchange" futures contracts and are therefore governed by the CEA. The Seventh Circuit Court of Appeals cogently explained the differences between valid "cash forward contracts" and illegal, "off-exchange" futures contracts in *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 786 (7th Cir.1999):

> Cash forward contracts permit parties who contemplate the physical transfer of a commodity to guarantee themselves, prior to the time of delivery, a buyer (or a seller) at a particular price, even though convenience or necessity requires delayed delivery or shipment. *See Andersons*, 166 F.3d at 318; *Co Petro*, 680 F.2d at 577–78. The CEA's prohibition of off-exchange contracts for "future delivery" seeks to regulate not this type of contract for the actual physical transfer of a commodity, but instead transactions driven by price speculation. *See Andersons*, 166 F.3d at 318; *Co Petro*, 680 F.2d at 577–78 (tracing the cash forward exclusion back to Congress' enactment of the Future Trading Act of 1921, which exempted from regulation future delivery contracts made by owners and growers of grain). In *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966 (4th Cir.1993), *cert. denied*, 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994), the Fourth Circuit explained:

>> Because the [CEA] was aimed at manipulation, speculation, and other

abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate "spot" transactions (transactions for the immediate sale and delivery of a commodity) or "cash forward" transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred) . . . . Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity "for future delivery" but excluded transactions involving "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2. The distinction, though semantically subtle, is what the trade refers to as the difference between "futures," which generally are regulated, and "cash forwards" or "forwards," which are not.

*Id.* at 970–71.

In contrast to cash forward contracts, futures contracts are mechanisms used to shift price risk and generally do not contemplate or result in the physical transfer of the underlying commodity:

[A futures contract] is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.

*Id.* at 971 (footnote omitted).

*Lachmund,* 191 F.3d at 786; *accord Grain Land Coop.* 199 F.3d at 990 n. 5 (quoting with approval the same segment of the Fourth Circuit Court of Appeals's decision in *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966 (4th Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994)).

ADM asserts that all federal appellate courts which have reached the merits of the question have held that HTAs like the ones involved in this litigation are valid cash forward contracts. *See Grain Land Coop.,* 199 F.3d at 993; *Haren v. Conrad Coop.,* 198 F.3d 683, 684 (8th Cir.1999); *see also Nagel v. ADM Investor Servs., Inc.,* 217 F.3d 436, 441 (7th Cir.2000); *Lachmund,* 191 F.3d at 789–90; *Andersons, Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 322 (6th Cir.1998). The Eighth Circuit Court of Appeals has adopted a multi-factor approach to determining whether contracts are cash forward contracts and instructed that a court should consider the intentions of the parties, the terms of the contract, the course of dealing between the parties, and any other relevant factors to determine whether the parties contemplated physical delivery of the grain, "the hallmark of an unregulated cash-forward contracts." *Grain Land Coop.,* 199 F.3d at

990–91. Drawing on this line of federal appellate case law, ADM contends that the HTAs involved here have all of the essential characteristics of cash forward contracts:

(1) The contract specifies idiosyncratic terms regarding place of delivery, quantity, or other terms, and so is not fungible with other contracts for the sale of the commodity, as securities are fungible. But there is an exception for the case in which the seller of the contract promises to sell another contract against which the buyer can offset the first contract, as in *In re Bybee*, 945 F.2d 309, 313 (9th Cir.1991), and *CFTC v. Co Petro Marketing Group, Inc.*, supra, 680 F.2d at 580. That promise could create a futures contract.

(2) The contract is between industry participants, such as farmers and grain merchants, rather than arbitrageurs and other speculators who are interested in transacting in contracts rather than in the actual commodities.

(3) Delivery cannot be deferred forever, because the contract requires the farmer to pay an additional charge every time he rolls the hedge.

*Nagel*, 217 F.3d at 441.

### a. *Contemplation of actual delivery of grain*

ADM asserts that because both the Producers and Wesley contemplated physical delivery of the grain, the HTAs at issue here are all un-regulated cash forward contracts.[10] *Grain Land Coop.*, 199 F.3d at 990–91. ADM directs the court's attention to the deposition testimony of several of the Producers. Plaintiff Richard Gardner testified he intended to deliver grain under the HTAs:

Q. Mr. Gardner, when you filed the lawsuit on June 5th, 1996, after that date, did you intend to deliver any grain under those contracts?

A. If the Contracts were valid, yes, I would have at some point in time.

Gardner Dep. at p. 99, ADM App. at p. 765. Plaintiff Ron Schmidt similarly stat-

---

**10.** The Producers' counsel soundly pointed out at oral arguments that delivery of the contracted commodity may occur under a futures contract. The Seventh Circuit Court of Appeals, however, observed that:

Although futures contracts specify delivery as a possible method of satisfying the short's obligations, it is much more common for such contracts to be closed out by the "buyer's" taking an offsetting position in a new contract identical but for its price. *Dunn v. CFTC*, 519 U.S. 465, 472, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, supra, 456 U.S. at 359 n. 18, 102 S.Ct. 1825 (only 3 percent closed out by delivery); *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir.1993); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1156 n. 2 (8th Cir.1971) (fewer than 1 percent closed out by delivery); *Reid, supra*, 44 Vill.L.Rev. at 129 n. 27. This option for getting out enables people who are not agriculturalists, and wouldn't know an ear of corn from a soybean if it

slapped them in the face, to speculate in the prices of commodities. In other words, these contracts are really a type of security, like common stock, rather than a means of fixing the terms by which farmers ship their output to grain elevators and other agricultural middlemen. It is because commodity-futures contracts are a type of security that Congress has seen fit to subject them to a regulatory scheme, the Commodity Exchange Act, which parallels that administered by the SEC for trading in corporate stock. There was no intention of regulating the commerce in agricultural commodities itself. But because futures contracts do contain a provision for delivery as an optional mode of compliance with obligations created by such contracts, rare as the exercise of that option is, it isn't always easy to determine just from the language of a contract for the sale of a commodity whether it is a futures contract or a forward contract. *Nagel*, 217 F.3d at 440.

ed that he intended with his HTAs to "try to market [his] grain at a more profitable level." Schmidt Dep. at p. 129, ADM App. at p. 1061. Plaintiff Phillip Asa admitted that he viewed his HTAs as a means to marketing his grain:

> Q. Is the flex-hedge program that you were discussing a program for marketing grain?
>
> A. Yes. That's what it was all about.

Asa Dep. at p. 14, ADM App. at p. 117. Two of the Producers, ASA and Brandt, actually delivered grain to Wesley under the HTAs. Edward Otis testified:

> Q: So when entering these—this program, you were intending to sell your grain; correct?
>
> A: That's correct.

Edward Otis Dep. at p. 54, ADM App. at p. 695.

ADM also points to a letter it received from plaintiffs' counsel as evidencing an intent on the part of the Producers to deliver grain under the HTAs. On January 8, 2001, the Producers' counsel, Scott Buchanan, sent a letter to all counsel in this case in which he wrote:

> You will find beneath the recap a detailed display of the elements used to derive the contract damage sum for each of our clients.
>
> By way of illustration, I would invite you to look at the Jim Otis data at 990025–28. At 25 you will see the flex hedge position for each of Jim's contracts extended over time as though he had been allowed to continue to roll from December to December. Eventually, the flex hedge price was better than the price available in the cash grain market. We contend that Jim, but for the elevator's breach, would then have filled those contracts by delivery of grain.
>
> . . . .

In other words, had Jim been permitted to continue to roll contract number 25, in December of 1999 he would have compared his flex hedge position to the available cash price . . . and, rationally, he would have then filled the flex hedge contract.

Buchanan Letter at p. 2, ADM App. at p. 1136. ADM also points out that none of the Producers testified during their respective depositions that they lacked the intent to delivery grain under the HTAs.

ADM contends that this evidence demonstrates that the producers intended to delivery grain under the HTAs and eliminates the need for any further analysis of the parties' intent to deliver. The Producers counter that their intent to deliver grain is a factual dispute and points the court to affidavits they have filed in resistance to ADM's motion for summary judgment in which they declare:

> 2. As a grain farmer, it was always my intention to market, sell and deliver to a buyer the grain that I grow. Regarding the flex hedge contracts, however, my intention was that, after harvest, I would determine whether to deliver the just-harvested grain against a flex hedge contract or roll the flex hedge position forward and sell my harvested grain on the cash market. Therefore, I had no obligation to deliver any grain under any flex hedge contract at any time. I also understand that the written terms of the flex hedge contracts permitted me to buy out at any time for a fee.

Asa Aff. at p. 1, Pls.' App. at p. 2; Brandt Aff. at p. 1, Pls.' App. at p. 7; Cink Aff. at p. 1, Pls.' App. at p. 14; Duane DeWaard Aff. at p. 1, Pls.' App. at p. 19; Everett Aff. at p. 1, Pls.' App. at p. 24; Gardner Aff. at p. 1, Pls.' App. at p. 29; Edward Otis Aff. at p. 1, Pls.' App. at p. 34; James

Otis Aff. at p. 1, Pls.' App. at p. 39; Schmidt Aff. at p. 1, Pls.' App. at p. 44.[11]

These portions of the Producers' affidavits would appear to generate a genuine issue of material fact regarding whether the Producers contemplated delivery of grain under the HTAs. The Producers' affidavits, however, also raise the issue of whether the affidavits transgress the principle that an affidavit that is in direct contradiction of prior deposition testimony does not raise an issue of material fact. *See RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir.1983).[12]

■ In determining whether the Producers' respective affidavits may be considered and whether it creates a genuine issue of material fact, this court must consider application of the rule identified in *Camfield* and any exceptions to it. In *Camfield,* the Eighth Circuit Court of Appeals was called upon to determine whether the conflict between a last minute affidavit and the affiant's earlier deposition testimony created a genuine issue as to

any material fact, thus precluding the entry of summary judgment for defendant under Federal Rule of Civil Procedure 56. *Camfield,* 719 F.2d at 1364. The court noted a split in the circuits on this issue. *Id.* (comparing the conclusions in *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540 (9th Cir.1975), which concluded that the conflict created by a later affidavit was not a genuine issue but a sham, and *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 893 (5th Cir.1980), which concluded that a genuine issue can be raised by a conflicting affidavit in certain circumstances). In *Camfield,* the Eighth Circuit Court of Appeals found that other courts had considered various factors that might be adequate to fall within an exception to the rule that conflicting affidavits do not create a genuine issue of fact. *Camfield,* 719 F.2d at 1364.[13] Finding none of these circumstances present in the case before it, the court ruled that the affidavit did not create a genuine but only a sham issue of fact. *Id.* at 1365.

Subsequent appellate decisions in this circuit have sometimes read *Camfield* as

---

**11.** The quoted language appears identically in each of the Producers' affidavits.

**12.** This court is no stranger to either the Eighth Circuit's decision in *Camfield* nor its application. This court has applied the *Camfield* decision in several of its prior published decisions. *See generally Waitek v. Dalkon Shield Claimants Trust,* 908 F.Supp. 672 (N.D.Iowa 1995) (holding that physician's affidavit created genuine issue of material fact even though it directly contradicted his prior deposition testimony where physician offered a plausible explanation for the change in his testimony); *Kunzman v. Enron Corp.,* 902 F.Supp. 882 (N.D.Iowa 1995) (holding that affidavits of two former co-workers would be considered and allowed to create a genuine or substantial factual issue, even though the plaintiff stated in his deposition that he was unaware of co-workers' knowledge, where the co-workers' affidavits specifically referred to a statement made in their presence and which

the defendants had not challenged in any other manner); *Rowson v. Kawasaki Heavy Indus., Inc.,* 866 F.Supp. 1221 (N.D.Iowa 1994) (holding that belated affidavit could be considered where affiant's memory was recently refreshed by photographs which he had not been shown during deposition).

**13.** Such factors included whether the inconsistency created by the affidavit existed within the deposition itself, or whether the affidavit explained certain aspects of the prior deposition, citing *Kennett–Murray,* 622 F.2d at 894–95, lack of access to material facts or newly discovered evidence, citing *Office Supply Co. v. Basic/Four Corp.,* 538 F.Supp. 776, 785–86 (E.D.Wis.1982), and lack of inherent inconsistency with the prior deposition, confusion in the deposition, and plausibility of the assertions in the affidavit, citing *Letson v. Liberty Mut. Ins. Co.,* 523 F.Supp. 1221, 1230 (N.D.Ga.1981). *Camfield,* 719 F.2d at 1364.

stating the rule that courts will not allow an affidavit in conflict with earlier sworn testimony to create an issue of fact. *See, e.g., Adams v. Greenwood,* 10 F.3d 568, 572 (8th Cir.1993) ("an affidavit denying what is established by one's own evidence ... does not preclude summary judgment"); *Schlup v. Delo,* 11 F.3d 738, 742–43 (8th Cir.1993) (concluding that same rule should apply in the context of *habeas corpus* litigation), *vacated on other grounds,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). However, other decisions have observed exceptions to the rule. *See, e.g., RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995) (noting that "[i]n *Camfield,* we held that contradictory affidavits will preclude summary judgment only if the prior testimony reflects confusion on the part of the witness and the affidavits explain why the earlier testimony is in conflict with the affidavits."); *Garnac Grain Co., Inc. v. Blackley,* 932 F.2d 1563, 1568 (8th Cir. 1991) (in *Camfield,* "[w]e noted that the affidavit presented by the plaintiff's president failed to 'explain aspects of his deposition testimony, nor [did] the deposition reflect any confusion on Camfield's part that ... require[d] explanation,'" and extending the holding with these exceptions to an affidavit submitted by a non-party); *Kim v. Ingersoll Rand Co.,* 921 F.2d 197, 199 (8th Cir.1990) (in *Camfield,* "we held in the context of summary judgment that unless a party explains the conflict in his own testimony, discrepancies in testimony do not create credibility issues for a jury when the district court perceives a readily apparent sham," and finding adequate explanation in the plaintiff's trial testimony of the discrepancy with prior testimony).

The court concludes that the rule in *Camfield* can most fairly be stated to be that an affidavit inherently contradicting the prior deposition testimony of the affiant and containing no explanation or clari-

fication for the disparity fails to generate a genuine issue of fact. *Landmark Bank of St. Charles County v. Saettele,* 784 F.Supp. 1434, 1439 (E.D.Mo.1992), *vacated on other grounds,* 21 F.3d 233 (8th Cir.1994). Decisions of the Seventh Circuit Court of Appeals, which has a rule similar to the one stated in *Camfield,* also stress the existence and plausibility of the affiant's explanation of the differences between his prior testimony and that found in the affidavit. *See, e.g., Unterreiner v. Volkswagen of Am., Inc.,* 8 F.3d 1206, 1210 (7th Cir.1993) ("'A party may not create a genuine issue of fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart,'" quoting *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir.1988)); *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir.1989) (affidavit in civil case must explain apparent inconsistency with deposition testimony in order to create an issue of fact on summary judgment); *Babrocky v. Jewel Food Co. and Retail Meatcutters Union, Local 320,* 773 F.2d 857, 861 (7th Cir.1985) (affidavits did not create factual issue precluding grant of summary judgment where they contradicted earlier deposition testimony without explaining the contradiction or attempting to resolve the disparity).

■ Here, from the court's review of the record, with the exception of plaintiff Gardner, the court does not perceive a direct contradiction between a plaintiff's deposition and their respective affidavit. The Producers use of the terms "sell" and "market" in their respective deposition testimony is not necessarily synonymous with delivery. Thus, the court cannot say that the Producers' deposition statements, with the exception of plaintiff Gardner, were so contradictory of the statements contained in their respective affidavit as to foreclose the affidavit's use for summary judgment

purposes. *See Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir.1980) ("In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition.").

However, because the court concludes that a direct contradiction exists between Gardner's deposition and affidavit, the court must scrutinize Gardner's affidavit to see if it presents a plausible explanation for its discrepancies with his prior testimony or other factors justifying an exception to the rule stated in *Camfield* and whether the affidavit generates a material issue of fact precluding summary judgment. Here, Gardner's affidavit offers no plausible explanation for his change in testimony. As a result, the court concludes that Gardner's affidavit does not fall within the exception stated in *Camfield* that an affidavit contradicting the prior deposition testimony of the affiant but containing an adequate explanation for the disparity may create a genuine issue of fact. The court finds that Gardner's affidavit does not create a genuine issue of material fact as to his intent to deliver grain under the HTAs. Thus, if Gardner's affidavit is excluded from consideration, the court concludes that Gardner has failed to set forth specific facts sufficient to raise a genuine issue for trial on his CEA claims because it is uncontradicted that he intended to physically deliver under the HTAs. Thus, with respect to his HTAs, there was a legitimate expectation that physical delivery of grain by him to Wesley would occur in the future. Therefore, the court grants ADM's motion for summary judgment on Gardner's CEA claims. This conclusion, however, leaves open the question of whether, under the muti-factor test approved by the Eighth Circuit Court of Appeals in *Grain Land Coop.*, 199 F.3d at 991–93, there existed a legitimate expectation on the part of the parties to the remaining HTAs " 'that physical delivery of the actual commodity by the seller to the original contracting buyer [would] occur in the future.' " *Id.* at 991 (quoting *Andersons, Inc.*, 166 F.3d at 318); *see Nagel*, 217 F.3d at 441; *Lachmund*, 191 F.3d at 787.

### b. Multi-factor analysis of contemplated delivery

In *Grain Land Coop.*, 199 F.3d at 991, the Eighth Circuit Court of Appeals instructed that in ascertaining an answer to the question of "whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future," courts should apply a multi-factor analysis and examine

> each transaction for such characteristics as whether the parties are in the business of obtaining or producing the subject commodity; whether they are capable of delivering or receiving the commodity in the quantities provided for in the contract; whether there is a definite date of delivery; whether the agreement explicitly requires actual delivery, as opposed to allowing the delivery obligation to be rolled indefinitely; whether payment takes place only upon delivery; and whether the contract's terms are individualized, rather than standardized.

*Id.; see Nagel*, 217 F.3d at 441 (adopting "totality of the circumstances" and noting that when the following three features are present that the contract will be deemed a cash-forward contract: "(1) The contract specifies idiosyncratic terms regarding place of delivery, quantity, or other terms, and so is not fungible with other contracts for the sale of the commodity, as securities are fungible ... (2) The contract is between industry participants, such as farmers and grain merchants ... (3) Delivery

cannot be deferred forever, because the contract requires the farmer to pay an additional charge every time he rolls the hedge .").

 Applying the multi-factor approach, the court concludes that the HTAs here are all cash-forward contracts. The court turns first to the terms of the HTAs themselves. As the Seventh Circuit Court of Appeals instructed in *Lachmund:*

> In determining whether a contract is a cash forward contract or a futures contract, our starting point must always be the words of the contract itself. The contract's terms will provide several indications of the nature of the transaction it memorializes. The document itself will reveal whether the agreement contemplates actual delivery, by indicating the following: whether the parties to the contract are in the business of producing or obtaining grain; whether the parties are capable of delivering or receiving actual grain in the quantities provided for in the contract; whether there is a definite date of delivery; whether the agreement explicitly requires actual delivery, as opposed to allowing delivery obligations to be rolled indefinitely into the future; whether payment takes place only upon delivery; and whether the contract's terms are individualized, as opposed to standardized.

*Lachmund,* 191 F.3d at 787.

Here, each of the HTAs are on identical form contracts. Blank spaces are provided on the HTAs for the "Contract No.," the name of the "Seller-producer," "Customer No.," "Merchandizer of delivery," "Broker," "Quantity," "Grain and Grade," "CBOT Futures Month and Price," "Delivery Mode," "Grades to Govern," and "Weights to Govern." Each of the HTAs also contained the following terms:

Time of Shipment

At least two days prior to the first notice day of the underlying futures month held or if a basis has been written, within the terms of the basis contract.

Terms and Rules: Flex Hedge Contract

* The Buyer (Merchandizer) and the Seller (Producer) will not write Flex Hedge Contracts or Multiple Year contracts for more than can be produced or will be delivered in a normal crop year by the producer.

* The Buyer has the discretion to be informed of the Producers past and current record of production.

* Final Pricing (Setting of the Basis Level and the Basis Delivery Month) will be done at the Sellers discretion, but a least two (2) days before the first notice day and before delivery occurs.

* Final pricing will be done at Merchandizers quoted (Basis Bid) for applicable delivery period. Once a basis is applied to a particular Flex Hedge Contract, all standard delivery contract terms will apply.

* This Flex Hedge Contract must be priced (Basis Set) or rolled to another futures month at a cost of one (1) cent plus or minus the spread to that futures month, prior to the first notice day of the underlying futures month currently held, by the Seller.

* If the underlying futures hedge is not rolled by the first notice day. The merchandizer will elect to roll.

* Multiple year Flex Hedges must be scaled up in subsequent price levels of proportionate and ascending levels.

* The Buyer and seller must be in agreement regarding a multiple year Flex–Hedge plan before it is submitted for implementation in the futures market.

\* If a Multi year plan is implemented and the Seller because of higher prices at harvest elects to roll the lower price level Flex Hedges for future use, the Seller will be obligated to deliver the harvested bushels to the buyer of the Flex Hedge Contracts rolled, at the Buyers quoted bid for the applicable period. The Seller may also elect to use an implemented Flex Hedge Contract equal to the current futures price for the applicable period.

\* The implementation or Rolling of Flex Hedge futures will be done during open and trading hours at the Chicago Board of Trade.

\* If it is determined by the Buyer and Seller that contract bushels are undeliverable, the Producer may elect to buy out of the Flex Hedge Contract at the net equity of the trade plus a cost of five (5) cents per bushel.

\* Failure by the Seller to advise the Buyer within 15 days of receipt of this confirmation will be understood by the Buyer as an acceptance of the terms.

Flex–Hedge Contract at p. 1, ADM App. at pp. 31, 33, 35, 37, 39, 41, 43, 45, 47, 49, 51, 53, 55, 57, 59, 61, 63, 65, 67, 69, 71, 73, 75, 77, 79.

It is uncontested that the Producers are farmers or officers of farming corporations engaged in the business of producing grain. Likewise, it is an uncontested fact that Wesley is a grain elevator involved in the business of purchasing grain from farmers for resale. Thus, the parties to these HTAs "are in the business of obtaining or producing the subject commodity." *Grain Land Coop.,* 199 F.3d at 991; *see Nagel,* 217 F.3d at 441 (identifying as one of the three central characteristics of a cash-forward contract the fact that the contract "is between industry participants, such as farmers and grain merchants").

The court further notes that the terms of the HTAs limited the amount of grain that could be contracted to no more than "can be produced or will be delivered in a normal crop year by the producer." Thus, by the terms of the HTAs, the Producers are capable of delivering the commodity in the quantities provided for in the contracts.[14] *See Grain Land Coop.,* 199 F.3d at 991; *see also Lambert,* 191 F.3d at 788 (considering such a factor and noting that "[t]herefore, it cannot be said that, although the parties are in the business of producing and buying grain, the contract quantities are so much greater than the parties' capacities that the contract, on its face, must not contemplate actual delivery.").

The HTAs here also contained definite dates of delivery. *See Grain Land Coop.,* 199 F.3d at 991. The court further finds that the HTAs here are individualized with respect to such terms as the quantity of grain, the grade and type of grain, the point of delivery, and the weights and grades that will govern. *See Grain Land Coop.,* 199 F.3d at 991; *see also Nagel,* 217 F.3d at 441 (considering whether "[t]he contract specifies idiosyncratic terms regarding place of delivery, quantity, or other terms ...."); *Lambert,* 191 F.3d at 788 (considering such a factor). Finally, the court concludes that while the HTAs do provide a rolling option, "delivery cannot be deferred forever, because the contract requires the farmer to pay an additional charge every time he rolls the hedge." *Nagel,* 217 F.3d at 441. Indeed, in *Oeltjenbrun v. CSA Investors, Inc,* 3 F.Supp.2d 1024(N.D.Iowa 1998), this court rejected the argument advanced by the

---

**14.** There is nothing in the record which would indicate that Wesley would be unable to receive the quantities of grain covered by the HTAs.

Producers here that the ability to roll their HTAs allows them to avoid delivery:

> This argument, however, disregards the fact that there are indeed limits on rolling in the contracts, because there is a price to be paid for every roll. Not only is there a spread/rolling fee, ... but the CBT price, and hence the cash price, changes that occur with every roll will eventually make it more cost effective to deliver on the contracts than to roll them.

*Oeltjenbrun,* 3 F.Supp.2d at 1044 (citations omitted). Since *Oeltjenbrun* was decided, the Eighth Circuit Court of Appeals and the Seventh Circuit Court of Appeals have both concluded that rolling fees effectively place a limit on a producers ability to engage in endless rolling. *Grain Land,* 199 F.3d at 992 (noting that a producer's "ability to roll the contracts merely allowed him to delay his delivery obligation rather than avoid it altogether."); *accord Nagel,* 217 F.3d at 442 (noting the fee for rolling "places a practical limit on how long delivery can be deferred.").

Therefore, applying a multi-factor analysis, the court concludes that the HTAs at issue in this litigation contemplated actual delivery of the subject grain.[15] Thus, because the parties to the HTAs had an obligation to make or take delivery of the subject commodities, the HTAs at issue here are cash forward contracts—i.e., contracts for "sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11)—that fall outside the purview of the CEA. As a consequence of this conclusion on the issue, ADM is entitled to summary judgment in its favor on Count VI. The court next turns to ADM's assertion that the Producers cannot demonstrate

any agency relationships between ADM and anyone who made representations regarding the HTAs.

### 2. Proof Of Agency Relationships

The Producers' claims are premised on allegations that certain representations were made to them regarding HTAs. It is uncontested that no ADM employees ever promoted the HTAs at issue in this case nor did any ADM employee ever make any representations or solicitations to any of the Producers. Rather, the Producers contend that defendants Agri–Plan and FAC–MARC, acting as agents of ADM, made representations and solicitations to the Producers regarding the HTAs on the behalf of ADM. ADM asserts that the Producers cannot establish that ADM granted anyone actual or apparent authority to make representations and solicitations to the Producers regarding the HTAs on its behalf. ADM contends that the absence of such proof is fatal to the Producers' claims against it.

#### a. Agency under Iowa law

An agency relationship may be established in three ways under Iowa law: an agent may possess express, implied or apparent authority. *See Gatzemeyer v. Vogel,* 544 F.2d 988, 992 (8th Cir.1976); *Mayrath Co. v. Helgeson,* 258 Iowa 543, 139 N.W.2d 303, 306 (1966); *see also Thorp Credit, Inc. v. Wuchter,* 412 N.W.2d 641, 646 (Iowa Ct.App.1987). An agent whose authority has been granted either expressly or by implication possesses actual authority to act on behalf of the principal. *Grismore v. Consolidated Prods. Co.,* 232 Iowa 328, 5 N.W.2d 646, 651 (1942); *see State v. Sellers,* 258 N.W.2d 292, 297

---

**15.** As Judge Easterbrook has astutely observed, "[e]rroneous business judgments many months after a contract was formed do not, however, change the nature of the contract from a forward to a future." *Nagel v. ADM Investor Servs.,* 65 F.Supp.2d 740, 750 (N.D.Ill.1999), *affirmed,* 217 F.3d 436, 441 (7th Cir.2000).

(Iowa 1977) ("Ordinarily, an agent has implied authority to act for his principal to accomplish the purposes of grants of express authority and may not extend actual authority unreasonably beyond the authority expressly granted."). On the other hand, apparent authority is that which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing. *Magnusson Agency v. Public Entity Nat'l Co.–Midwest,* 560 N.W.2d 20, 25 (Iowa 1997); *Helgeson,* 139 N.W.2d at 306; *Hall v. Crow,* 240 Iowa 81, 34 N.W.2d 195, 200 (1948). A determination of an express or implied agency focuses on communications and contacts between the principal and the agent. In describing express authority, the Iowa Supreme Court has observed:

> "An agency results from the manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to his control, and consent by the other so to act. \*\*\*
>
> An agency may be proven not only by direct evidence of an agreement between the parties but also by circumstantial evidence, such as their words and conduct, from which the intention to create an agency may be fairly implied."

*Walnut Hills Farms, Inc. v. Farmers Coop. Co.,* 244 N.W.2d 778, 781 (Iowa 1976) (quoting *Martin v. Jaekel,* 188 N.W.2d 331, 333–34 (Iowa 1971)).

Creation of apparent authority, on the other hand, focuses on the effect the principal's conduct or communications has on a third party:

> Apparent authority is authority which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing. *Magnusson Agency v. Public Entity Nat'l Co.–Midwest,* 560

N.W.2d 20, 25–26 (Iowa 1997). Apparent authority must be determined by what the principal does, rather than by any acts of the agent. *Id.* The burden of showing that an agent acted within the scope of the agency's actual or apparent authority is on the party claiming that such authority existed.

*Hendricks v. Great Plains Supply Co.,* 609 N.W.2d 486, 493 (Iowa 2000); *Magnusson Agency,* 560 N.W.2d at 25; *Waukon Auto Supply v. Farmers & Merchants Sav. Bank,* 440 N.W.2d 844, 847 (Iowa 1989); *Sellers,* 258 N.W.2d at 297; *Grismore,* 5 N.W.2d at 651. As the Iowa Supreme Court pointed out in *Sellers:*

> "Stated inclusively, then, the rule is that if a principal acts or conducts his business either intentionally, or through negligence, or fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, such principal is bound by the acts of the agent within the scope of his apparent authority as to any person who, upon the faith of such holding out, believes, and has reasonable ground to believe, that the agent has such authority, and in good faith deals with him."

*Sellers,* 258 N.W.2d at 297 (quoting 3 Am. Jur.2d, *Agency,* § 74 at 477 (1973)).

■ In the present case, the clearing agreement between Agri–Plan and ADM unequivocally states that Agri–Plan is not an agent of ADM:

> 15. IB is an independent contractor and not an agent of ADM. Without prior written approval of ADM, IB will not use the ADM name on its door or on its office facility, on its stationary, in its telephone listing or in any other commercial listing. IB shall not use the name ADM in answering its telephone or in any other way hold itself out to be

associated with ADM other than in the relationship of independent contractor, i.e. IB to a futures commission merchant which carries IB's trades on a disclosed basis and holds the funds of its customers. In contracting for support services such as rent, telephone, quotations, utilities and the like IB shall contract in its own name and not use or refer to the name ADM.

Clearing Agreement at pp. 5–6, ADM App. at 847–48. The CTA agreement between ADM and FAC–MARC similarly contains a provision outlining the scope of their relationship which explicitly states that FAC–MARC is not an agent of ADM:

1. SCOPE OF RELATIONSHIP. Advisor is not an employee, joint venturer, or partner of ADM, and Advisor *shall have no authority, express or implied, to act as an agent of ADM.* Advisor shall have no authority to represent, contract for or bind ADM, or to assume or create any obligation on behalf of ADM. Advisor agrees that it shall not hold itself out or represent to any person to the contrary.

CTA Agreement at p. 1, ADM App. at p. 827 (emphasis added).

The significance of these disclaimers of agency is that, in the absence of contrary evidence, they demonstrate a lack of express authority for either FAC–MARC or Agri–Plan to act as agents for ADM. *See Hendricks,* 609 N.W.2d at 493 (noting that "[e]xpress authority is derived from specific instructions by the principal in setting out duties ...") (quoting *Dillon v. City of Davenport,* 366 N.W.2d 918, 924 (Iowa 1985)). The Producers have not come forward with evidence that ADM authorized Agri–Plan, FAC–MARC, or Hofmeister to take any action on its behalf with regard to HTAs. Because, under Iowa law, implied authority "includes all such incidental authority as is necessary, usual and proper to

effectuate the main authority expressly conferred," *Newberry v. Barth, Inc.,* 252 N.W.2d 711, 714 (Iowa 1977), the absence of proof of any grant of express authority means that implied authority cannot be demonstrated.

As noted above, apparent authority must be determined by the principal's actions rather than by any acts of the putative agent. *Hendricks,* 609 N.W.2d at 493; *Magnusson Agency,* 560 N.W.2d at 25; *Newberry,* 252 N.W.2d at 714. Thus, the actions of FAC–MARC or Agri–Plan in promoting HTAs and encouraging the Producers to enter into HTAs are insufficient to establish that either entity was acting with apparent authority from ADM.

### b. Effect of Introducing Broker status

■ The Producers counter that regardless of what the documents between ADM and Agri–Plan state, an actual agency relationship existed between ADM and Agri–Plan because of Agri–Plan's status as an IB of ADM. The flaw in this argument is that an entity's mere status as a guaranteed IB does not render it an agent of its associated FCM. Precisely such a claim was rejected by the Seventh Circuit Court of Appeals in *Lachmund:*

Here, Mr. Lachmund submits that his complaint adequately pleads agency because it alleges the specific fact that A/C is a guaranteed IB of ADMIS. However, we agree with the CFTC that this status, by itself, is not sufficient to give an IB the status of an agent.

*Lachmund,* 191 F.3d at 783; *see Katz v. Financial Clearing & Servs. Corp.,* 794 F.Supp. 88, 94 (S.D.N.Y.1992) ("An introducing broker is not acting as an agent of the clearing broker when the introducing broker makes fraudulent misrepresentations to its customers."). The Commodity Futures Trading Commission ("CFTC")

has declined to find that a guarantee agreement between an IB and FCM, without more, denotes an agency relationship. *See Violette v. First Options of Chicago, Inc.,* No. 95–R128, Comm.Fut.L.Rep. (CCH) ¶ 26,951, 1997 WL 71438, at *3 (CFTC Feb. 20, 1997), ADM Auth. App., Ex. 21 at *3 ("The Commission has never held that status as a guaranteed IB, standing alone, is sufficient to establish agency."). The legislative history behind the creation of IBs underscores the logic of these decisions. The D.C. Circuit Court of Appeals provided the following historical review of the creation of the IBs just last year:

> An FCM is the commodity market's equivalent of a securities brokerage house, soliciting and accepting orders for futures contracts and accepting funds or extending credit in connection therewith. *See* Timothy J. Snider, Regulation of the Commodities Futures and Options Markets § 6.04 (2d. ed.1997). Prior to 1982, FCMs did business with the public both through their own employees, known as "associated persons," and through loosely affiliated "agents." S.Rep. No. 97–384, at 40 (1982). The main function of many such agents was to procure business for FCMs. *See id.* at 111. These agents were largely unregistered and unregulated. *See id.* at 40.
>
> In 1982, the CFTC advised Congress that the number of agents was growing significantly, and that FCMs who used them "have often disavowed any responsibility for violations of the Act by these 'agents.'" *Id.* The Commission proposed that "each 'agent' of a futures commission merchant be required to register as an associated person of that futures commission merchant." *Id.* Congress, however, did not adopt the CFTC's recommendation. As the Senate Committee on Agriculture, Nutrition, and Forestry explained:

> [T]he Committee felt it would be inappropriate to (1) require these independent business entities to become branch offices of the futures commission merchants through which their trades are cleared or (2) to impose vicarious liability on a futures commission merchant for the actions of an independent entity.

> *Id.* at 41. At the same time, Congress acknowledged the need "to guarantee accountability and responsible conduct of such persons," *id.,* who "deal with commodity customers and, thus, have the opportunity to engage in abusive sales practices," *id.* at 111. To resolve this dilemma, Congress drafted legislation requiring all persons who solicit or accept customer orders for FCMs to register with the CFTC, but permitting them to register either as "associated persons" of the FCMs, or as part of a new class of registrants called "introducing brokers." *Id.* at 112. The latter were conceived of as independent entities that solicited and accepted customer orders but used the services of FCMs for clearing, record keeping and retaining customer funds. *See id.* at 41. To guarantee the accountability of introducing brokers, the Commission was authorized to require them to meet "minimum financial requirements." *See id.*

*First American Discount Corp. v. CFTC,* 222 F.3d 1008, 1012 (D.C.Cir.2000). Thus, the legislative history behind the creation of IBs demonstrates Congressional intent not to render IBs agents of FCMs merely because of their status as IBs.

Where, as here, the IB is engaged in non-CEA regulated activity, the court concludes that an IB of an FCM is not rendered an agent of the FCM by its mere IB status. *See Cunningham v. Waters Tan & Co.,* 65 F.3d 1351, 1359 (7th Cir.1995)

(holding that an "[FCM], by entering into a guarantee agreement with [IB] as an individual, never agreed to guarantee [IB's] other venture as a commodity pool operator—an activity of which [FCM] was never made aware."); *cf. Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 122 (5th Cir.1996) (noting that "[a] Futures Commission Merchant is strictly liable for the Commodities Exchange Act violations of its brokers if such violations occur within the scope of employment.").

■ The Producers have failed to point to any evidence that would indicate that ADM provided Hofmeister, Agri–Plan or FAC–MARC with the actual or apparent authority to act on ADM's behalf with regard to HTAs, or that it encouraged Hofmeister, Agri–Plan, or FAC–MARC to act on its behalf with regard to any cash-forward transactions.[16]

#### c. Supervision

■ The Producers also contend that ADM's FCM status required it, under CFTC regulations and the rules of the National Futures Association ("NFA"), to supervise its guaranteed IBs. As a result, the Producers argue that these oversight requirements establish that ADM had sufficient control over Agri–Plan as to give rise to an agency relationship. The court admits that the Producers' argument has a visceral appeal. However, the CFTC and NFA require all FCMs to undertake certain supervisory liabilities concerning CEA regulated futures and options. *See* 17 C.F.R. § 166.3 (outlining supervisory duties); NFA Compliance Rule 2–9, ADM Auth.App., Ex. 24. Thus, adoption of this

exception would swallow the rule denoted above that an IB's status as a guaranteed IB, standing alone, is insufficient to establish agency.

Moreover, even were the court to accept the premise that CEA, CFTC and NFA's supervisory requirements created an agency relationship between FCMs and IBs, the scope of any such agency would only encompass futures contracts not cash-forward grain contracts, such as are involved in this litigation, which are not regulated by the CEA and CFTC. *See* 7 U.S.C. § 1a(11); *Oeltjenbrun*, 3 F.Supp.2d at 1035–37.

The court concludes, for the reasons discussed above, that the Producers have failed to come forward with sufficient evidence to generate a genuine issue of material fact regarding the existence of an agency relationship between ADM and Agri–Plan, FAC–MARC, or Hofmeister. Therefore, ADM's motion for summary judgment is granted as to all claims against it.

### C. FAC–MARC And Agri–Plan's Joinder In ADM's Motion

Defendants FAC–MARC and Agri–Plan have joined in ADM's motion for summary judgment. The court has concluded that the HTAs at issue here are cash forward contracts that fall outside the purview of the CEA. As a consequence, FAC–MARC and Agri–Plan are entitled to summary judgment in their favor on the Producers' CEA claims found in Count VI. However, because FAC–MARC and Agri–Plan have only joined ADM's motion for summary judgment, and not independently moved

---

**16.** Because FAC–MARC was not a signatory to the guarantee agreement entered into by ADM and Agri–Plan, the guaranteed IB relationship between ADM and Agri–Plan would not render FAC–MARC an agent of ADM. *See Cunningham*, 65 F.3d at 1358 (holding that

"[non-signatory to IB guarantee agreement] possessed no authority from [FCM]—express, implied or apparent—to conduct business relating to commodity pools; [non-signatory to IB guarantee agreement] was never an agent of any kind for [FCM].").

for summary judgment, summary judgment cannot be granted with respect to the remaining claims against FAC–MARC and Agri–Plan.

### D. The Producers' Motion For Partial Summary Judgment

The Producers have sought partial summary judgment on three issues: whether Agri–Plan was an agent of ADM; whether the solicitation of HTAs fell within the scope of that alleged agency relationship; and, whether ADM's supervision of Agri–Plan was inadequate. For reasons set out above, *see supra* at § II(B)(2), the court has concluded that: neither FAC–MARC or Agri–Plan had express, implied or apparent authority to act as agents for ADM; that where, as here, an IB is engaged in non-CEA regulated activity, that IB is not rendered an agent of the FCM by its mere IB status, and; that ADM's FCM status did not require it, under CFTC regulations and the NFA rules, to supervise its guaranteed IBs with respect to cash-forward grain contracts which are not regulated by the CEA and CFTC. Therefore, the Producers' motion for partial summary judgment is denied.

### E. Wesley's Motion For Partial Summary Judgment

Wesley has moved for summary judgment on the Producers' claims found in Counts VI, VII, VIII, IX, and XII of the Second Amended Complaint. The court will address each of these claims in turn.

#### 1. CEA claims

Wesley seeks summary judgment on the Producers' CEA claims. The court has already concluded, *see supra* at § II(B)(2), that the HTAs in this case are cash forward contracts not governed by the CEA. Therefore, Wesley's motion for summary judgment is granted as to the Producers'

CEA claims found in Counts VI, VIII, and IX.

#### 2. Breach of fiduciary duty

Wesley also seeks summary judgment on the Producers' claim for breach of fiduciary duty found in Count XII of the Second Amended Complaint. Wesley advances a two-pronged argument on this count. First, Wesley asserts that the Producers cannot establish that they had a fiduciary relationship with Wesley. Wesley further argues that even if the Producers can generate a genuine issue of material fact on the issue of whether Wesley had a fiduciary relationship with the Producers, the Producers have failed to prove that Wesley breached it alleged duty to them.

#### a. Fiduciary relationships under Iowa law

As this court explained in *Oeltjenbrun,* the Iowa Supreme Court has defined a fiduciary duty as follows:

"A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts §. 874 cmt. a (1979)). We have also noted that

a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind. . . . The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."

*Hoffman v. National Med. Enters., Inc.,* 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman,* 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962))....

.... [W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Kurth,* 380 N.W.2d at 696.

*Oeltjenbrun,* 3 F.Supp.2d at 1053 (quoting *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied,* 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997)); *see also Corcoran v. Land O'Lakes, Inc.,* 39 F.Supp.2d 1139, 1154 (N.D.Iowa 1999) (quoting *Oeltjenbrun* ); *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 647–48 (Iowa 1995) (also recounting indicia of a fiduciary relationship); *Anderson v. Boeke,* 491 N.W.2d 182, 188 (Iowa Ct.App.1992) (" 'A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship,' " quoting *Kurth,* 380 N.W.2d at 695, in turn quoting RESTATEMENT (SECOND) OF TORTS § 874 cmt. a).

As this court also explained in *Oeltjenbrun* and *Corcoran,*

"Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another." *Irons v. Community State Bank,* 461 N.W.2d 849, 852 (Iowa Ct.App.1990). Fiduciary duty arises, for example, between attorneys and clients, guardians and wards, and principals and agents. *Kurth,* 380 N.W.2d at 698; *accord Engstrand v. West Des Moines State Bank,* 516 N.W.2d 797, 799 (Iowa 1994) (citing *Kurth* ).

*Oeltjenbrun,* 3 F.Supp.2d at 1053; *Corcoran,* 39 F.Supp.2d at 1154 (quoting *Oeltjenbrun* ); *accord Zumaris,* 538 N.W.2d at 647–48 ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.").

#### b. Inferences of a fiduciary relationship

Wesley relies on this court's conclusion in *Oeltjenbrun* that a fiduciary duty does not arise when the record at best demonstrates an arm's-length business relationship between the plaintiff and the purported fiduciary. *Oeltjenbrun,* 3 F.Supp.2d at 1053. The Producers counter that the record here, unlike the record in *Oeltjenbrun,* suggests more than a simple arm's-length business relationship between the Producers and Wesley.

From the court's review of the record, although an extremely close question, the court concludes that the Producers have come forward with sufficient evidence to generate a genuine issue of material fact on the issue of whether the relationship between them and Wesley was of the kind to give rise to a fiduciary duty. The Producers' reliance on Art Beenken's knowledge and expertise is exemplified by the deposition testimony of George Detmering, former chairman of the Wesley board of directors:

Q. How did the folks in the community and elevator patrons view Art, if you can tell me that?

A. Well, I think they thought he was real good because we were getting our dividends. That's part of what an elevator is supposed to be doing. They're

supposed to be buying and selling grain, and any profit made can go back to the owners.

Q. Art seemed to be able to do that?

A. Yes.

Q. Do you know how he was able to do that?

A. No, I don't. I never could figure that out. I couldn't figure out why Wesley was just five years and Wooden and Tit and some of these were twenty years or more behind. I never figured that out. I haven't figured it out, but now I'm wondering. I've got some idea, but I don't think I dare.

Q. Do you think it had anything to do with his trading activities?

A. Yes.

Q. How did patrons interact with Art? Was he somebody they looked to and relied on or—

A. I think so, yeah.

Q. What kind of things would people rely on Art to—

A. Well, they would go in there and ask him when to sell grain, and he would tell them. But then the next week it might be just the opposite of what he told them. Not always, but sometimes.

Q. Would he help people select their products for inputs?

A. Yep. For—yes.

Q. Would he help them identify— would he identify seed and so forth for them?

A. Seeds and fertilizer.

Q. Was he able to discuss soil conditions and soil types with people?

A. With soil tests. We did a lot of soil tests and he would read those for them and help them.

Q. He would help people analyze their soil conditions?

A. Yep, yep.

Q. Would he make recommendations as to how they should fertilize that soil or what crops might be best?

A. Well, generally that was on the soil test sheet. They would come back with what the recommendation was, and then he would either agree with that or maybe cut it back a little sometimes.

Q. He would help them interpret that?

A. Yeah.

Q. Would he talk to people about the type of equipment they were using?

A. I don't think so.

Q. And you mentioned that he would—

A. Unless it was sprayers, and the elevator had sprayers, so I don't know. I don't think so.

Q. Not so much equipment?

A. No.

Q. You mentioned that he would talk to people about selling grain. Was he in conversation frequently with patrons about the marketing of their grain?

A. I think so, yes.

Q. People would ask him about when to sell?

A. Yeah.

Q. Did you witness that personally yourself?

A. He did it with me.

Q. He would advise you?

A. Yes.

Q. Were you aware, did you personally see that he advised other people about when to sell grain?

A. I don't know that I could say that, no.

Q. But did you have knowledge that he was doing that?

A. I think he was, yeah.

Q. And that people were talking with him about that?

A. Yep.

Q. Did he ever claim to deny that he would advise people about how to market their grain?

A. I don't think so.

Detmering Dep. at pp. 24–27, ADM App. at p. 830–31.

Robert Becker testified that he relied on Beenken's recommendations and advice on marketing his grain:

Q. At any time did Art Beenken ever tell you that there was unlimited risk associated to a flex-hedge position?

A. No.

Q. When Mr. Beenken told you to roll and deliver on the cash market, did he ever suggest that you do any—what did he suggest for you to deliver on the cash? In other words, how, what vehicle was used?

A. That would have been my '95 grain.

Q. Was it for immediate delivery or future delivery?

A. No. He recommended that I sell it under—it was either March or May delivery, I'm not sure, for $3 a bushel.

Q. And did you follow his advice?

A. Yes, I did.

Q. Was that unusual for you to ask Mr. Beenken his advice on grain?

A. No, it wasn't.

Q. Did you follow Mr. Beenken's advice when he would give it to you on marketing grain?

A. Yes, I did.

Q. Was there any question in your mind that Mr. Beenken knew that you would be using his advice in marketing grain?

A. No.

Robert Becker Dep. at pp. 220–21, ADM App. at p. 632–33.

The Producers have also come forward with evidence that Beenken, in his roll as advisor to the Producers, promoted the flex-hedge program. This evidence is ex-emplified by the deposition testimony of Jim Otis:

Q. What did he tell you? And I—I'd really like you to tell me in as much detail as you can recall what he told you?

A. Well, I remember him telling me that as a young farmer, with lacking capital that I still am, I couldn't afford not to do a program like this because you basically were setting a floor for your grain which is what I was already doing with my sealing grain through the government, my sealing program. And so it was something I was already doing, so that sounded good, and it would give me just a lot of options. I mean I could—I had this floor set and when it come time for that contract to come up, I had the option to look at it, and say: You know, which should I use? Should I use the contract, or should I still sell the cash? And I could do that anytime of year providing the contract would be rolled ahead.

Jim Otis Dep. at pp. 33–34, ADM App. at p. 708.

Thus, the court concludes from its review of the record that the Producers have come forward with sufficient evidence to generate a genuine issue of material fact on the issue of whether the relationship between them and Wesley was of the kind to give rise to a fiduciary duty, and whether Wesley breached that duty in the advice given to the producers regarding the HTAs. Therefore, Wesley is not entitled to summary judgment on Count VIII of the Second Amended Complaint and this portion of Wesley's motion is denied.

### III. CONCLUSION

The court initially concludes that the HTAs at issue in this litigation contemplated actual delivery of the subject grain. Because the parties to the HTAs had an obligation to make or take delivery of the

subject commodities, the HTAs at issue here are cash forward contracts that fall outside the purview of the CEA. Therefore, ADM is entitled to summary judgment in its favor on Count VI. The court further concludes that the Producers have failed to come forward with sufficient evidence to generate a genuine issue of material fact regarding the existence of an agency relationship between ADM and Agri–Plan, FAC–MARC, or Hofmeister. Therefore, ADM's motion for summary judgment is granted as to all claims against it. With respect to defendants FAC–MARC and Agri–Plan's joinder in ADM's motion for summary judgment, because the court has concluded that the HTAs at issue here are cash forward contracts that fall outside the purview of the CEA, summary judgment is granted in their favor on the Producers' CEA claims found in Count VI. The court further concludes that the Producers' motion for partial summary judgment is denied. The court grants Wesley's motion for summary judgment on the Producers' CEA claims because the HTAs in this case are cash forward contracts not governed by of the CEA. Therefore, Wesley's motion for summary judgment is granted as to the Producers' CEA claims found in Counts VI, VIII, and IX. Finally, the court concludes from its review of the record that the Producers have come forward with sufficient evidence to generate a genuine issue of material fact on the issue of whether the relationship between the Producers and Wesley was of the kind to give rise to a fiduciary duty, and whether Wesley breached that duty in the advice given to the producers regarding the HTAs. Therefore, the remainder of Wesley's motion for summary judgment is denied.

**IT IS SO ORDERED.**