# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2373

_____

Asa-Brandt, Inc., a/k/a Asa-Brandt   *
Partnership; Philip Asa; Keith Brandt;   *
Robert Becker; Dennis Cink; Duane   *
DeWaard; Beverly Everett; Richard   *
Gardner; Edward A. Otis; Ronald L.   *
Schmidt; Debra Schmidt; Jim Otis;   *
  *
    Plaintiffs-Appellants;   *
  *
     v.   *   Appeals From the United States
  *   District Court for the
ADM Investor Services, Inc.;   *   Northern District of Iowa.
  *
    Defendant-Appellee;   *
  *
FAC-MARC, Inc.; Agri-Plan, Inc.;   *
Competitive Strategies for Agriculture,   *
Ltd.; Farmers Cooperative Society;   *
Gold Eagle Cooperative;   *
  *
    Defendants.   *

_____

02-2374

_____

Asa-Brandt, Inc., a/k/a Asa-Brandt   *
Partnership; Philip Asa; Keith Brandt;   *
Robert Becker; Dennis Cink; Duane   *
DeWaard; Beverly Everett; Richard   *
Gardner; Edward A. Otis; Ronald L.   *

Schmidt; Debra Schmidt; Jim Otis;          *
                                           *
          Plaintiffs-Appellees;            *
                                           *
               v.                          *
                                           *
ADM Investor Services, Inc.;               *
                                           *
               Defendant;                  *
                                           *
FAC-MARC, Inc.; Agri-Plan, Inc.;           *
Competitive Strategies for Agriculture,    *
Ltd.;                                      *
                                           *
               Defendants;                 *
                                           *
Farmers Cooperative Society; Gold          *
Eagle Cooperative;                         *
                                           *
          Defendants-Appellants.           *

_____

Submitted:  February 13, 2003

Filed:  September 11, 2003
_____

Before WOLLMAN, HEANEY, and MELLOY, Circuit Judges.
_____

HEANEY, Circuit Judge.

These are appeals[1] from separate orders by the district court granting summary judgment for ADM Investor Services, Inc. against Asa-Brandt, Inc., et al., and denying Farmers Cooperative Society its motions for judgment as a matter of law or a new trial. Our task in weighing these appeals has been made difficult because the record as designated by the parties often contains only abbreviated references to the testimony and documents relied upon by the parties, and both parties' briefs frequently fail to reference specific pages in the appendices or transcripts used to buttress their positions. We affirm the district court with respect to its denial of Farmers Cooperative Society's post-trial motions, its grant of summary judgment to ADM Investor Services, Inc. in whole on the plaintiffs' Racketeer Influenced and Corrupt Organizations Act claim and in part on the plaintiffs' Commodity Exchange Act claim, and its denial of the plaintiffs' cross-motion for partial summary judgment. We reverse the district court's order granting summary judgment to ADM Investor Services, Inc., on the plaintiffs' CEA claims as to Philip Asa, Robert Becker, Keith Brandt, and Dennis Cink, reverse the district court's order granting summary judgment to ADM Investor Services, Inc. on the plaintiffs' state law claims as to all the farmers, and remand.

## I. Background

These cases primarily involve hedge-to-arrive contracts (HTAs) between grain producers and grain elevators for the sale and purchase of grain entered into in 1994 and 1995.[2] In an HTA, a grain producer agrees to deliver at an unspecified time a

---

[1]Although heard separately by this court, the appeals have been consolidated for clarity in one opinion.

[2]A detailed recitation of the facts can be found in the district court opinion. Asa-Brandt, Inc. v. ADM Investor Serv., Inc., 138 F. Supp.2d 1144 (N.D. Iowa 2001). See Abels v. Farmers Commodities Corp., 259 F.3d 910, 914 (8th Cir. 2001), Lachmund v. ADM Investor Servs., 191 F.3d 777, 779 (7th Cir. 1999), Charles F. Reid, Note, Risky Business: HTAs, *The Cash Forward Exclusion and Top of Iowa*

predetermined quantity and grade of grain.  The price of the grain is determined by reference to a futures contract price established by the Chicago Board of Trade (CBOT), plus or minus a variable component referred to as the "basis."  "Basis is the difference between the price of the designated futures contract and the cash price for that commodity."  Grain Land Coop v. Kar Kim Farms, Inc., 199 F.3d 983, 987 (8th Cir. 1999).  The basis remains unfixed, or "floating," until the farmer elects to fix the basis, at which point the grain will be delivered.  Under an HTA, a farmer has at least two sale options on his crop:  he can deliver grain under the HTA, or he can defer delivery on (i.e., "roll") the contract if he thinks he can get a better price in the cash-grain market (the current market price for grain).  The buyers of the grain, usually grain elevators, would enter into HTAs with farmers and then establish a position equal to the contract with the farmers on the CBOT.  In other words, the elevator would agree to sell on the CBOT the grain it agreed to purchase from the farmer.  If the farmer elected to roll his HTA, the grain elevator would buy back its position on the CBOT (as it now had no grain to sell on that date) and would establish a new position on the CBOT consistent with the rolled HTA.

From 1995 to 1996, the grain market experienced unexpected price hikes.  This market "inversion" created an environment where farmers consistently could make more money selling on the cash market, and consequently those farmers with HTA contracts continually rolled their HTAs, as their grain was more valuable now than in the future.  Grain elevators across the country were forced to buy back expensive positions on the CBOT and purchase less valuable futures positions.  The continual rolling added up to enormous margin costs on the HTAs.  The question of whether farmers could continually roll their contracts, and who should pay for these large margin costs, sparked litigation throughout the Bread Belt.

---

*Cooperative v. Schewe*, 44 Vill. L. Rev. 125 (1999), for explanations of HTAs and their place in the commodities market.

Among the litigants were Asa-Brandt, Inc. and nine additional farmers, who, after being informed by their grain elevator that they owed the elevator money on the HTAs, and that they could no longer roll the contracts, brought an action in federal district court against, inter alia: ADM Investor Services, Inc. (ADM), a Futures Commission Merchant (FCM); Agri-Plan, Inc., a registered guaranteed Introducing Broker (IB); Competitive Strategies for Agriculture, Ltd.,[3] also an IB; FAC-MARC, a Commodity Trading Advisor (CTA);[4] and the Farmers Cooperative Society of Wesley, Iowa (Wesley), a grain elevator.[5] They alleged claims under state law and violations of the Commodity Exchange Act (CEA) and the Racketeer Influenced and Corrupt Organizations (RICO) Act. Gunderson v. ADM Investor Servs., Inc., 43 F.

---

[3]It does not appear from the record that Competitive Strategies for Agriculture, Ltd., remains involved in this litigation. In 1998, the Commodity Futures Trading Commission found this IB had violated the anti-fraud provisions of the Commodity Exchange Act and CFTC regulations.

[4]A Futures Commission Merchant is an individual or organization that accepts orders to buy or sell futures contracts for grain, and accepts money or other assets from customers in connection with such orders; the FCM must be registered with the Commodity Futures Trading Commission. An Introducing Broker is a firm or individual who solicits and accepts futures orders from customers but does not accept money or other compensation from the customer. The broker, however, shares in commission paid to the merchant by the producer. An IB must be registered with the CFTC, and must carry all of its accounts through an FCM. A Commodity Trading Advisor is an individual or organization that advises others on buying or selling commodities and commodity futures contracts, in return for compensation. Registration with the CFTC is generally required.

[5]In March 2002, Wesley consolidated with Gold Eagle Cooperative of Goldfield, Iowa. Gold Eagle notified the court by letter on July 22, 2002, of its intention to join in Wesley's brief and arguments, and filed no additional brief on its own behalf.

Supp.2d 1058 (N.D. Iowa 1999).[6] In Gunderson, the district court dismissed the claims against ADM, concluding that the farmers failed to sufficiently allege an agency relationship between ADM and any other defendant making fraudulent representations for the purposes of Fed. R. Civ. P. 9(b).[7] Gunderson, 43 F.Supp.2d at 1065. The farmers appealed the district court's decision.

On appeal, we noted that in determining whether an agency relationship exists, the question hinged on the principal's right to exercise control over the activities of the agent. Gunderson v. ADM Investor Servs., Inc., No. 99-4032, 2000 WL 1154423, at *2 (8th Cir. Aug. 16, 2000). We concluded that the farmers pleadings were sufficient to meet even the heightened standard of Rule 9(b), reversed the district court and remanded the case. Id. at *3.

On remand, ADM again moved to dismiss the farmers' complaints. On February 13, 2001, the district court denied in part ADM's renewed motion to dismiss[8] insofar as it related to the farmers' fraud claims, stating that this court's 2000 decision controlled the matter. Gunderson v. ADM Investor Servs., Inc., Nos. C96-3148-MWB, C96-3151-MWB, 2001 WL 624834, at *7 (N.D. Iowa Feb. 13, 2001). It then divided the numerous claims before it into four separate cases, with the farmers grouped against the specific grain elevators they were suing, and proceeded with, among others, the instant case. ADM was sued by all the farmers, and so remained a party in all the suits, including this one.[9]

---

[6]The claims brought by the Farmers were part of a larger action by farmers against grain elevators and commodity trading firms.

[7]Rule 9(b) mandates that fraud claims must be pleaded with particularity.

[8]No appeal from this order is before us.

[9]ADM and the plaintiffs in the remaining cases entered into a stipulation that a decision in this case would bind the remaining cases. The parties now disagree on

ADM then moved for summary judgment on all the claims against it, and Asa-Brandt, Inc. and the nine additional farmers remaining in this suit (the Farmers) moved for partial summary judgment on the existence and scope of the agency relationship between Agri-Plan and ADM, and on ADM's failure to supervise Agri-Plan. On April 18, 2001, the district court granted ADM's motion for summary judgment, and denied the Farmers' cross-motion, determining that the Farmers had failed to present sufficient evidence to support their agency allegations against ADM. Asa-Brandt, Inc. v. ADM Investor Servs., Inc., 138 F. Supp.2d at 1165-69 (N.D. Iowa 2001).  It partially granted Wesley's motions for summary judgment,[10] but allowed the case against Wesley to continue.  Id. at 1174.   On July 13, 2001, a jury returned a verdict against Wesley and in favor of the Farmers on their breach-of-contract and breach-of-fiduciary duty claims, and awarded the Farmers damages of $744,000 for breach of contract and nominal damages for breach of fiduciary duty.  The jury also awarded the Farmers punitive damages in the amount of $45,000 for the breach of contract and nearly $1.25 million for the breach of fiduciary duty.[11]  On May 10, 2002, the district court denied Wesley's post-trial motions for judgment as a matter of law, or, alternatively, for a new trial.  Asa-Brandt, Inc. v. Farmers Coop. Soc'y, No. CO1-3021-MWB, 2002 WL 1714197 (N.D. Iowa May 10, 2002).

Wesley now appeals the district court's denial of its motions of judgment as a matter of law and for a new trial.  The Farmers appeal the district court's grant of

the interpretation of that stipulation, particularly with regard to whether the facts in the remaining cases could be used as evidence in this case.  The dispute will be resolved by the district court on remand.

[10]No appeal was taken from this portion of the district court's order.

[11]The jury awarded separate damages to each farmer based on their particular circumstances, but for the purposes of this appeal, we have consolidated the damages award.

summary judgment to ADM and the court's concurrent denial of the Farmers' summary judgment motion.

## II. Legal Analysis

We consider each appeal in turn, addressing the issues raised by the appealing parties.

### A. Wesley

Wesley makes four challenges to the district court. First, it argues it was entitled to judgment as a matter of law because there was no fiduciary relationship between itself and the Farmers. Next, Wesley argues the district court erred in allowing damages awards on the Farmers' breach-of-contract claim. Third, it contends the punitive damages on the breach-of-contract and fiduciary duty claims should be set aside. Finally, Wesley requests a new trial because the district court allowed allegedly irrelevant and prejudicial evidence to be introduced against them.

We review the district court's denial of judgment as a matter of law de novo, applying the same standards as the district court. Norton v. Caremark, Inc., 20 F.3d 330, 334 (8th Cir. 1994). We therefore: 1) consider the evidence in the light most favorable to the prevailing party, assuming as true all facts which the prevailing party's evidence tended to prove; 2) assume the jury resolved all conflicts of evidence in favor of that party; 3) give the prevailing party the benefit of all inferences which may be reasonably drawn from the facts; and 4) uphold the denial of the motion even if reasonable jurors could differ as to the conclusion that could be drawn from the evidence. Id. When reviewing the denial of a motion for a new trial, we look only for a clear abuse of discretion. Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000).

## 1. Fiduciary Duty

Wesley argues that neither Art Beenken, the Wesley manager, nor Wesley had a fiduciary relationship with the Farmers. The jury instructions in this case required the Farmers to prove four elements: 1) that Wesley owed a fiduciary duty to the plaintiff; 2) that Wesley breached its fiduciary duty; 3) that the breach of fiduciary duty was a proximate cause of damage to the plaintiff; and 4) the amount of damages incurred. See Asa-Brandt v. Farmers Coop. Soc'y, No. CO1-3021-MWB, 2002 WL 1714197, at *4 (N.D. Iowa May 10, 2002). Wesley focuses its challenge on the question of duty, and contends that finding a fiduciary duty was owed by a buyer to a seller would be unprecedented. We disagree.

It is not without precedent for a jury to find a fiduciary relationship between a farmer and a cooperative. See Top of Iowa Coop. v. Schewe, 324 F.3d 627, 634 (8th Cir. 2003) ("[T]he jury could have reasonably concluded that a fiduciary duty existed between Top of Iowa and Schewe.") Like Top of Iowa, the jury in this case heard evidence that Wesley's manager, Art Beenken, was more experienced, more sophisticated, and more privy to information than were the Farmers about HTAs and the risks inherent in their use. The Farmers also testified that they were encouraged by Beenken to enter into HTAs, and that they relied upon his advice in executing them.

Obviously, this fiduciary relationship did not arise through a simple buyer/seller relationship. Rather, as the district court found, it arose through the Farmers' reliance upon their cooperative, its manager, and his advice to them with respect to growing and marketing their grain, advice which included measures to improve their yield, when to sell their grain, and, most importantly, how to use HTAs to enhance the profitability of their operations. Given the evidence presented, we will not disturb the jury's finding that a fiduciary relationship existed between the Farmers and Wesley.

## 2. Damages on Breach of Contract

Wesley challenges the compensatory damages award for the breach of contract on two grounds. First, they argue the damages calculations were speculative. Wesley also contends the Farmers' claims are barred by judicial estoppel.

Wesley asserts that the jury's damage calculations are not based on any reasonably certain facts, but are rather based upon arbitrary assumptions. Specifically, the jury had to assume that the HTA contracts were rolled, that the Farmers waited until November 15 of each year to roll the contracts, that they rolled from December to December of each year, and that the Farmers would deliver under the contracts at the time the contract price exceeded the cash price. Wesley therefore contends the damages are too speculative to be upheld.

It should not come as a surprise to Wesley that farmers who entered HTA contracts would roll their HTAs at some point. Indeed, they were told they could do so. And there is no basis in the record to suggest that the Farmers would rationally choose to deliver under the contracts at a time when the cash price exceeded the contract price. The very purpose of HTAs is to deliver grain under the contract when the contract price exceeds the cash price. The only "arbitrary" calculations are November and December assumptions. They are, however, driven by the rational assumption that the Farmers would roll their contracts until their contract price exceeded the cash price, so there is nothing in the record to indicate selecting those dates was unreasonable. There was a rational basis for the jury calculations, and that is sufficient. Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc., 519 F.2d 634, 641 (8th Cir. 1975). We therefore uphold the award.

Wesley also argues the damage claims are barred by judicial estoppel. It contends that in 1996 the Farmers took the position that the HTAs were illegal and unenforceable, and then in 2001 the Farmers argued they should be permitted to

collect damages for the breach of the same contracts, positions which Wesley argues were plainly inconsistent. The district court found Wesley had failed to preserve its claim of error on judicial estoppel, and that appears to be the case. Nonetheless, even if we were to consider Wesley's argument we would find that it lacks merit. The doctrine of judicial estoppel is intended to prohibit a party from taking inconsistent positions in the same or related litigation. Hossaini v. W. Mo. Med. Ctr., 140 F.3d 1140, 1142-43 (8th Cir. 1998). The purpose of judicial estoppel is to protect the integrity of the judicial process. Id. at 1143. In 1996, it was still an open question whether HTAs were considered futures contracts or cash-forward contracts. See In re Grain Land Coop, 978 F. Supp. 1267, 1272 (D. Minn. 1997) ("[B]oth sides seek declaratory judgments as to the applicability of the CEA to the contracts in question."). Since the nature of HTAs was unclear in 1996, the Farmers could properly argue at that time that the HTAs were considered futures contracts. As the nature of HTAs' legal status became clearer, the Farmers' arguments evolved to reflect the state of the law. The Farmers' positions are not inconsistent; they rather incorporate developing law, and they are not barred by the doctrine of judicial estoppel.

### 3. Punitive Damages

Next, Wesley argues that a breach of contract, even if intentional, does not warrant punitive damages under Iowa law. Further, it argues that punitive damages are not appropriate for the Farmers' breach-of-fiduciary-duty claims.

While ordinary breaches of contract, even if intentional, are not sufficient to support awards of punitive damages, Seastrom v. Farm Bureau Life Ins. Co., 601 N.W.2d 339, 347 (Iowa 1999), when "the breach is accompanied by or results in independently tortious actions or fraudulent activity," punitive damages are permissible, Watkins v. Lundell, 169 F.3d 540, 544-45 (8th Cir. 1999) (citing Pogge v. Fullerton Lumber Co., 277 N.W.2d 916, 919-20 (Iowa 1979)). The Farmers argue

-11-

that the jury was properly instructed on the law, and that Wesley did not object to the applicable jury instruction.[12] We therefore presume that the jury found evidence that the breach of contract was accompanied by or resulted in tortious or fraudulent activity. There is ample evidence in the record to support such a finding. The breach of contract claim arose from margin calls that arguably would not have been necessary (or a breach of contract) had Wesley not fraudulently misrepresented the nature of the HTAs. The district court properly relied upon the jury's verdict in denying Wesley's motions for judgment as a matter of law, and we affirm its decision.[13]

As to whether the award of punitive damages from Wesley's breach of fiduciary duty was excessive, we think the district court's analysis following BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996), was correct.[14] The district court noted that Gore was instructive in determining whether a punitive damage award was excessive, and examined the punitive damage award in light of Gore's three guideposts: "the degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil [and criminal] penalties authorized or imposed in comparable cases." Asa-Brandt v. Farmers Coop. Soc'y, No. CO1-3021-MWB, 2002 WL 1714197, at *6 (N.D. Iowa May 10, 2002)

---

[12]We find no mention of this instruction, Jury Instruction No. 10, in either Wesley's opening or reply brief.

[13]Wesley does not argue that the punitive damages from the breach of contract were excessive.

[14]Although Wesley does not raise the issue on appeal, we note that punitive damage awards stemming from nominal damages are appropriate under Iowa law. Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co., 510 N.W.2d 153, 156 (Iowa 1993) (citing Pringle Tax Serv., Inc. v. Knoblauch, 282 N.W.2d 151, 154 (Iowa 1979)).

(quoting Gore, 517 U.S. at 575). First, the district court noted that, when assessing punitive damages, they should not be grossly out of proportion to the severity of the offense. Id. In order to determine whether the punitive damages were appropriately proportional, the district court followed Gore's hierarchy of reprehensibility. Id; see also State Farm Mut. Auto. Ins. Co.v. Campbell, 123 S. Ct. 1513, 1521 (2003).[15] It found the Farmers presented evidence that Wesley acted with apparent disregard for others' rights. Farmers Coop. Soc'y, 2002 WL 1714197, at *6. Wesley's conduct, according to the hierarchy of reprehensiveness, was clearly more reprehensible than the conduct in Gore, and is at a similar level to the conduct in State Farm. Its conduct therefore warranted a substantial punitive damage award.

Next, the district court considered the disparity between the actual or potential harm to the Farmers and the punitive damages award. See Gore, 517 U.S. at 580-81; State Farm, 123 S. Ct. at 1524. On appeal, we consider "'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result from the defendant's conduct* as well as the harm that has actually occurred.'" Gore, 517 U.S. at 581(quoting TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 460 (1993)). The jury was presented with evidence that, if Wesley's scheme had worked, the Farmers would have been required to pay Wesley sums totaling more than $3.9 million. The record supports the view, therefore, that a punitive damage award of nearly $1.25 million is "a fraction of the harm likely to result from Wesley's

---

[15]The Supreme Court in State Farm declared:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

conduct." Asa-Brandt v. Farmers Coop. Soc'y, No. CO1-3021-MWB, 2002 WL 1714197, *6-7 (May 10, 2002). Accord TXO Prod. Corp., 509 U.S. at 460 ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to his intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred."); Dean v. Olibas, 129 F.3d 1001, 1007 (8th Cir. 1997) ("[I]n imposing punitive damages it is proper to consider not only the harm that actually resulted from the defendant's misdeeds but also the harm that *might have* resulted."); Pulla v. Amoco Oil Co., 72 F.3d 648, 659-60 (8th Cir. 1995) (Byron White, J., sitting by designation); United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1230-31 (10th Cir. 2000).

We conclude the punitive damages award for Wesley's breach of fiduciary duty was not excessive.[16]

## 4. Evidentiary Errors

Finally, Wesley raises a number of challenges to the district court's evidentiary rulings and requests a new trial. We review evidentiary rulings for abuse of discretion. Bergfeld v. Unimin Corp., 319 F.3d 350, 355 (8th Cir. 2003). Wesley argues the district court refused to allow Wesley to mention that the Farmers originally sought to declare the HTAs illegal and void, and that the Farmers wanted to end the contracts, rather than roll them forward for years to come. Again, we do not think it unreasonable for the Farmers to change legal positions, especially when the nature of the disputed agreement remained unclear and undecided. At the time

---

[16]The third guidepost looks to "the disparity between the punitive damages award and 'the civil penalties authorized or imposed in comparable cases.'" State Farm, 123 S. Ct. at 1526 (quoting Gore, 517 U.S. at 575). This has no application here, as neither party could direct the lower court to federal, civil, or criminal penalties for Wesley's conduct, nor do they raise the issue on appeal.

of this trial, the Farmers were proceeding on a single theory, and we cannot say it was an abuse of discretion to prevent Wesley from presenting evidence that the Farmers had argued an alternative legal theory years earlier. Wesley also challenges the district court's decision to allow managers from other grain elevators with no relationship to Wesley to testify about their handling of HTAs. After wrestling with the mountains of evidence in this case and wading through complex economic and legal theories, we agree it was appropriate for the district court to educate the jury as to various methods of organizing and managing HTAs. We see no prejudicial harm in comparing methods of managing HTAs, as it most likely helped the jury understand how these contracts operated. We find no abuse of discretion by the district court's evidentiary rulings.

We affirm the district court as to Wesley's appeal.

## B. ADM

The Farmers appeal the district court's grant of summary judgment with respect to ADM. We review a grant of summary judgment de novo, applying the same standard as the district court. Meyers v. Nebraska Health & Human Serv., 324 F.3d 655, 658 (8th Cir. 2003). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The heart of the Farmers' argument before the district court was that they had presented sufficient evidence to support their claims under state law, the Commodity Exchange Act[17], and the Racketeer Influenced and Corrupt Organizations Act.[18] Although they presented no evidence that ADM was directly responsible for the

---

[17]7 U.S.C. § 1 -27(f).

[18]18 U.S.C. § 1961-1968.

alleged wrongdoings, they asserted that ADM exercised control over Agri-Plan, FAC-MARC, and Dennis Hofmeister,[19] who advised the Farmers and solicited them to enter into HTAs. Thus, the Farmers argue that ADM was responsible for their harm, resulting from entering into HTAs. The district court disagreed. It held, "the producers have failed to come forward with sufficient evidence to generate a genuine issue of material fact regarding the evidence of an agency relationship between ADM and Agri-Plan, FAC-MARC, or Hofmeister." Asa-Brandt, Inc. v. ADM Investor Servs., Inc., 138 F. Supp.2d 1144, 1169 (N.D.Iowa 2001). In light of this holding, the district court did not reach the question of whether ADM either knew or should have known that the marketing material and seminars presented by Hofmeister, et al., misrepresented the risks involved in entering HTA contracts.

The threshold question on appeal, then, is whether there was sufficient evidence from which a jury could find that there was an agency or "enterprise" relationship between Agri-Plan, FAC-MARC, Hofmeister, and ADM.

## 1. Agency

We previously decided that the Farmers alleged facts in their complaint of an agency relationship between FAC-MARC, Agri-Plan, and ADM that were sufficient to withstand a motion to dismiss. Gunderson v. ADM Investor Servs., Inc., No. 99-4032, 2000 WL 1154423 (8th Cir. Aug. 16, 2000). We noted that a principal is liable for an agent's fraud if an agency relationship exists, and the principal puts the agent in a position to defraud innocent third parties. Gunderson, 2000 WL 1154423, at *2 (citing First Am. State Bank v. Continental Ins. Co., 897 F.2d 319, 326 (8th Cir. 1990)). Although we acknowledged an IB's mere status was insufficient to create an agency relationship with an FCM, we found that the farmers had made additional

---

[19]Dennis Hofmeister was, at all relevant times, president of both Agri-Plan and FAC-MARC.

-16-

allegations, to wit, that ADM was responsible for supervising IBs, including approving I Bs' marketing materials and seminars, ensuring that IBs did not misrepresent the risk of trading HTAs, and that ADM knew or should have known that the risks of HTAs were misrepresented at the seminars. Id. We noted that the question of whether HTAs were unregulated cash-forward contracts was ordinarily a question of fact, and that even if the HTAs were not regulated futures contracts within ADM's purview as an FCM, the farmers had sufficiently alleged ADM was responsible as a principal for the fraudulent promotion of HTAs. Id. at *3. These holdings become the law of the case. In re Just Brakes Corporate Sys., Inc., 293 F.3d 1069, 1072 (8th Cir. 2002). Our first question, then, is whether the Farmers satisfied the standards we outlined in Gunderson and introduced evidence of an agency relationship sufficient to withstand a motion for summary judgment.

Agency is "the fiduciary relation[ship] that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." S. Pac. Transp. Co. v. Cont'l Shippers Ass'n, Inc., 642 F.2d 236, 238 (8th Cir. 1981) (citing Armstrong v. Republic Realty Mortgage Corp., 631 F.2d 1344, 1348 (8th Cir. 1980)). An agent's authority may be apparent, express or implied. See Gatzemeyer v. Vogel, 544 F.2d 988, 992 (8th Cir. 1976). Actual authority exists if the agent has been granted authority to act on the behalf of the principal "either expressly or by implication." AgriStor Leasing v. Farrow, 826 F.2d 732, 738 (8th Cir. 1987). Actual authority "focuses on communications and contacts between the principal and the agent." Id. Apparent authority, by contrast, is "determined by what the principal does, rather than by any acts of the agent." Grismore v. Consolidated Prod. Co., 5 N.W.2d 646, 651 (Iowa 1942); See also Restatement (Third) of Agency § 2.03 (Tentative Draft No. 2, 2001) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").

The district court concluded that Agri-Plan and FAC-MARC lacked any actual authority–express or implied–because 1) Agri-Plan's mere status as an IB did not create an agency relationship between it and ADM, Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 783 (7th Cir. 1999), and 2) the agreement between Agri-Plan and ADM expressly denied any agency relationship between the parties. These statements are consistent with our decision in Gunderson, 2000 WL 1154423, at *2.

This leads us to the question of apparent authority. As Gunderson noted, the Farmers must show evidence of an agency relationship beyond Agri-Plan's IB status if they are to prove Agri-Plan was an agent of ADM. As to the agreements between Agri-Plan, et al., and ADM, the existence of documents disclaiming an agency relationship only negates the existence of actual authority; it does not, however, affect the creation of an agency relationship through apparent authority. We therefore examine the record for evidence of apparent authority upon which a fact-finder could rely.

The following facts are undisputed: Dennis Hofmeister organized both FAC-MARC and Agri-Plan, and acted as president of both entities; Hofmeister used a single office for both entities; Hofmeister and the employees of Agri-Plan and FAC-MARC frequently presented HTAs along with cash-grain and futures marketing plans on the same occasion; Agri-Plan agreed it would not open any branch office without obtaining ADM's approval; and ADM had the power to reject employees hired by Agri-Plan.

The Farmers also offered deposition testimony that Hofmeister required them to open futures accounts with ADM in order to enter into an HTA contract. This claim is not fully supported by the record. While FAC-MARC did "require a client to maintain an account with Agri-Plan, Inc.," and while Agri-Plan was required to carry all their accounts with ADM, only a few of the Farmers actually opened futures accounts with ADM through Agri-Plan.

-18-

Moreover, consistent with CFTC and National Futures Association (NFA) regulations, ADM audited Agri-Plan. 17 C.F.R. § 166.3 (2003), NFA Rule 2-9 (April 23, 2002) *available at* http://www.nfa.futures.org/nfaManual/entireManual.asp#2-9. The Farmers submitted an audit report, written by an ADM official, that noted Dennis Hofmeister, in his role as an IB, "need[ed] to be watch[ed]." A fact-finder could well draw the inference from this notation that the ADM official was referring to promoting and marketing both futures and HTAs, and sought to control his activities in both areas because of their inter-relationship.

The evidence also shows that ADM issued a compliance manual to Agri-Plan, and expected it to comply with the manual. ADM argues the manual simply recited the legal and regulatory requirements of the CFTC and the NFA, and therefore was not evidence of an agency relationship between it and Agri-Plan. It also argues that even if the compliance manual were found to create an agency relationship, it would only govern Agri-Plan's actions regarding futures. We note that ADM's compliance manual includes the substance of NFA Compliance Rule 2-29 on General Prohibitions. However, the manual goes beyond the rule. Rule 2-29 in the manual lists, inter alia, Section D, titled "Supervisory Procedures for ADM Investor Services, Inc.", and recites:

> ANY SALES EFFORTS, PROMOTIONAL MATERIAL OR ADVERTISEMENTS MUST BE REVIEWED AND APPROVED BY THE BRANCH OFFICE MANAGER OR DESIGNATED SUPERVISOR PRIOR TO DISTRIBUTION. IN ADDITION, ALL PROMOTIONAL MATERIAL MUST BE SUBMITTED TO THE COMPLIANCE DEPARTMENT OF ADM INVESTOR SERVICES, INC., PRIOR TO ITS FIRST USE.

(Appellants' App. at 120.) As an initial matter, this language (even without the specific references to ADM) is not found anywhere in Section 2-29 of the NFA Compliance Rules. While the NFA clearly wants FCMs to watch their IBs for any

misrepresentations, in our view, a fact-finder could determine the above language indicates a broader control than Rule 2-29 mandates. ADM's compliance guideline could have simply requested that an IB submit its promotional materials to ensure they comply with Rule 2-29. Instead, ADM requires an Introducing Broker to submit all promotional material, something well beyond the scope of the NFA's requirements.

Assuming arguendo that the language from ADM's compliance manual implicitly covered only futures sales by their Introducing Brokers, there is evidence from which a fact-finder could conclude that at the time these transactions occurred ADM considered HTAs to be futures. See In re Grain Land Coop, 978 F. Supp. 1267, 1272 (D. Minn.1997) (noting the lack of "clear guidance from the face of the statute as to distinguishing excluded forward contracts from regulated futures contracts").

The undisputed facts, together with the disputed evidence presented by the Farmers through depositions, affidavits, and exhibits, are sufficient to get to the fact-finder on the question of whether Agri-Plan and FAC-MARC were agents of ADM.

## 2. The Farmers' Theories of Recovery

Having determined that there was sufficient evidence of agency to overcome a motion for summary judgment, we next turn to whether the Farmers could prevail on any of their theories of recovery. The Farmers' claims fall into three categories: tort claims under Iowa state law,[20] fraud under the CEA, and violations of RICO.

---

[20]The Iowa state claims against ADM allege fraudulent misrepresentation and breach of fiduciary duty.

### a. CEA and State Law Claims

In 1999, our court established that HTAs are not regulated under the CEA. Grain Land Coop v. Kar Kim Farms, Inc., 199 F.3d 983 (8th Cir. 1999). The Farmers assert that they may still recover under the CEA because 7 U.S.C. § 6b(a),[21] the anti-fraud provision of the CEA, encompasses cash-forward contracts such as the HTAs. We cannot agree with such a broad reading of the CEA, as this would essentially usurp our holding in Grain Land that the contracts are not regulated by the CEA. This, however, does not absolve ADM of potential liability under the CEA.

In order to maintain a claim against ADM under the CEA, the Farmers must establish that the IB–in this case, Agri-Plan–was engaged in the sale of contracts regulated under the CEA, such as futures. If the only function of Dennis Hofmeister and his controlled corporations was to deal in unregulated HTA contracts for the Farmers, they could not assert a valid CEA claim. Philip Asa, Robert Becker, Keith Brandt, and Dennis Cink, however, have produced evidence these plaintiffs opened futures accounts through Hofmeister, these accounts were carried by ADM, and that there was a strong nexus between these futures accounts and their HTA contracts.

First, it is undisputed that ADM carried these plaintiffs' futures accounts. They signed contracts which reference ADM, and ADM endorsed many of the checks these

---

[21]Section 6b(a)states, in relevant part:

It shall be unlawful . . . (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof . . .(i) to cheat or defraud or attempt to cheat or defraud such other person.

plaintiffs paid to Hofmeister's corporations to cover their investment costs. There is testimony that Hofmeister and his corporations advised the Farmers that in order to take part in the "flex-hedge" program (which included the HTA contracts), they were required to open a futures account with his company, Agri-Plan. Because Agri-Plan was a guaranteed IB, it worked directly and exclusively with ADM. There is further evidence that when plaintiffs started to lose money on their HTAs, Hofmeister encouraged them to become active in trading their futures so as to cover any losses. Asa, Becker, Brandt, and Cink have produced evidence that establishes a link between their futures accounts with ADM and their HTA contracts. As to the remaining plaintiffs, however, none have come forward with evidence that they opened any regulated futures account through Hofmeister, his companies, or ADM. Thus, they are missing the link essential to establishing liability under the CEA. Accordingly, we reverse the district court's grant of summary judgment on the Farmers' CEA claims as to Asa, Becker, Brandt, and Cink, and affirm as to the remaining plaintiffs.

We next consider whether summary judgment was appropriate on the Farmers' state law claims of fraudulent misrepresentation and breach of fiduciary duty. In Gunderson, our court reversed the dismissal of the Farmers' common law claims because "plaintiffs have sufficiently alleged that ADMIS was responsible as a principal for the fraudulent promotion of HTA agreements." Gunderson, 2000 WL 1154423, at *2. Recognizing it was bound by that holding, the district court refused to consider dismissing the state law claims on this basis in one of its earlier opinions. See Gunderson v. ADM Investor Servs., Inc., 2001 WL 624834, at *7 (noting that issue of whether plaintiffs had sufficiently alleged fraudulent acts or misrepresentation was "controlled by the Eighth Circuit Court of Appeals' August 16, 2000, decision in this case"). It did not revisit this issue in its order granting ADM summary judgment. Nonetheless, it did dismiss the state law claims based on the lack of an agency relationship, which, as discussed above, was in error. Thus, we reverse

the grant of summary judgment to ADM on the Farmers' state law claims, and remand for further proceedings.[22]

### b.  The RICO Claim

The Farmers argue they provided sufficient evidence to support their RICO claims and defeat summary judgment.  To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation.  Hamm v. Rhone-Poulenc Rorer Pharms., Inc., 187 F.3d 941, 951 (8th Cir. 1999).  Then a RICO plaintiff must prove the defendant "engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Handeen v. Lemaire, 112 F.3d 1339, 1347 (8th Cir. 1997).

The Farmers failed to prove at least one of the critical elements of a RICO claim, to-wit, the existence of an "enterprise."  The enterprise is not the pattern of racketeering activity. United States v. Turkette, 452 U.S. 576, 583 (1981).  Rather, the enterprise must have a common or shared purpose, some continuity of personnel, and an ascertainable structure distinct from the pattern of racketeering. Handeen, 112 F.3d at 1351.  Even if we agreed with the Farmers that ADM had a relationship with specific individuals that may satisfy the structure and personnel requirements, it appears that relationship was not of a conspiratorial nature.  The Farmers asserted throughout their brief, reply brief, and at oral argument that Hofmeister was someone who "needed to be watched" because he engaged in risky behavior.  There is little to suggest the relationship between ADM and Hofmeister, et al., rose to the level of a conspiracy.  The Farmers therefore fail to prove there was any "enterprise" for the

---

[22]We are aware that because the district court dismissed the state law claims based on the absence of evidence of agency, it did not consider whether the Farmers could establish either the liability or damage elements of these claims.  We decline to consider those issues here.  The parties are free to raise these issues on remand.

purposes of its RICO claim.[23]   We therefore affirm the district court's grant of summary judgment against the Farmers on their RICO claim.

### c. ADM's Alternative Arguments

ADM argues that the Farmers have not suffered any actual damages, and if they did, they were proximately caused by Wesley, not ADM or its agents.  ADM further contends that all of plaintiffs' fraud claims fail for lack of scienter.  The district court never considered these issues, having granted the motion for summary judgment based on the issue of agency.  We pass no judgment on these arguments, but remand for the district court's consideration.[24]

### III. Conclusion

We affirm the district court with respect to its denial of Wesley's post-trial motions, its granting summary judgment to ADM on the Farmers' RICO claim, and denial of the Farmers' cross-motion for partial summary judgment.  However, because the Farmers have established a jury question as to whether Dennis Hofmeister, Agri-Plan, and FAC-MARC acted as agents of ADM concerning the Farmers' contracts, we reverse for Asa, Becker, Brandt, and Cink the district court's order granting summary judgment to ADM on their CEA claim, and we reverse for all the Farmers on their state law claims.  We remand to the district court for proceedings consistent with this opinion.

---

[23]For the purposes of brevity, we do not engage in an analysis of whether the Farmers could prove the other three RICO elements.

[24]We do not consider the district court's denial of summary judgment to the Farmers, as there appears to be no appeal of that decision.  If there was, we think the drastically different interpretations of the evidence in this case would preclude any grant of summary judgment.

Also pending before us is the Farmers' motion to strike portions of Wesley's reply brief, and for sanctions.  Having considered the motion, we hereby deny it.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.